LEMMON, Judge.
This is a medical malpractice case. Mr. and Mrs. S. J. Margiotta have appealed from a judgment dismissing their suit after a trial on the merits. The issue is whether any substandard professional conduct by Dr. Louis Trachtman caused or contributed to the death of the Margiotta’s six-month old daughter.
On April 29, 1971 at approximately 7:30 p. m. Mrs. Margiotta found the infant apparently lifeless in her crib, with a plastic bag (used for her brother’s toys) over her head. After the mother applied multiple slaps to the buttocks, the child began breathing.
Mrs. Margiotta immediately placed a telephone call to the medical exchange for the child’s pediatrician. About 20 minutes later, Dr. Trachtman called, identifying himself as the physician on call for the clinic. The doctor commended her for properly handling the emergency and directed her to bring the child to the clinic in the morning for extensive testing. Mrs. Margiotta expressed her concern about lack of oxygen for an undetermined period, since she had not checked on the child for about IS minutes prior to finding her with the bag over her head. The mother de *152 scribed the baby as limp, blue in color, and unresponsive to stimulus such as snapping of fingers. (The doctor testified he was told the baby was sitting up and acting normal and thus concluded the emergency had passed). The telephone conversation lasted about IS minutes.
Still apprehensive after the conversation, Mrs. Margiotta and a neighbor decided to take the child to the hospital emergency room and arrived there at 8:37 p. m. Coincidentally, Dr. Trachtman was in that hospital and was the doctor who was summoned to handle the patient. When he learned that nothing significant had occurred since their telephone conversation, he refused to examine the baby (in the mother’s arms), despite the mother’s pleas, and, pointing to the door, directed Mrs. Margiotta to get another doctor if she wanted the child examined.[1]
Mrs. Margiotta attempted unsuccessfully to obtain medical attention through another clinic and, although the baby’s appearance improved, took the child to the emergency room at another hospital, arriving at 9:20 p. m. A surgical resident examined the child and found her to be alert and breathing normally, with good color and no apparent distress. This doctor instructed Mrs. Margiotta to return home and observe the child and to call or come back if further problems developed.
About 11:30 p. m. Mrs. Margiotta observed the baby’s body jerking spasmodically and her eyes rolled back. The mother returned to the hospital, where the doctor’s examination revealed essentially the same findings as the earlier one. However, the doctor prescribed an anti-convulsive drug and admitted the child for observation.
The mother described several less violent seizures during the night, none of which were observed by medical personnel. At the resident’s request a staff surgeon examined the child at 3:00 a. m. and reported all findings normal. Thus two physicians at that hospital performed examinations within eight hours of the suffocation incident and found no evidence of residual damage that may have occurred.
The next afternoon (April 30) an examination by Dr. William Terral, a pediatrician, revealed an alert and active child who showed no neurological or respiratory deficits. Dr. Terral arranged for an electroencephalogram on May 3 (Monday), and the test was reported as normal.
After midnight of May 4 Mrs. Margiotta found the baby unconscious with pink mucus about the mouth. At Dr. Terral’s request an internal medicine specialist performed an emergency room examination and found the child alert and breathing normally, with no clinical evidence of organic illness.
The next morning (May 5) Dr. Terral found the child alert, active and normal in every respect, except for minimal upper respiratory infection, for which he prescribed medication.
In a May 6 telephone conversation with Dr. Terral, Mrs. Margiotta reported no further untoward occurrences.
On May 10 Mrs. Margiotta found the child dead in the crib.
The autopsy protocol listed findings of pulmonary congestion, visceral congestion, and interstitial pneumonitis, the latter probably viral in etiology.
The Margiottas premise their case on the fact that the child was healthy before the incident and was never the same thereafter. Contending anoxia (absence of oxygen) can cause permanent damage to the respiratory control center in the brain, they urge that Dr. Trachtman should have administered oxygen immediately upon learning on the telephone of the bag incident in order to rehabilitate any temporarily damaged brain tissue.
*153 From the medical evidence on proper professional procedure, we conclude Dr. Trachtman should have performed an examination immediately upon being informed on the telephone that the child exhibited the symptoms described after her oxygen supply was cut off for an undetermined period. Nevertheless, the Margiot-tas’ circumstantial evidence does not preponderate in favor of a conclusion that Dr. Trachtman’s failure to examine and treat the child immediately contributed to causing her death 12 days later (or that immediate treatment by him would more probably than not have prevented the death).
Causation, like any other fact, can be proved by circumstantial evidence. Proof by direct or circumstantial evidence is sufficient to constitute a preponderance when the evidence, taken as a whole, shows that the fact or causation sought to be proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
In response to hypothetical questions, Dr. Terral answered that he would examine and determine the general condition of an infant as soon as possible after she is found with a plastic bag over her head. He stated deprivation of oxygen causes impairment of brain cells, which may be permanent or temporary, depending on length of deprivation. By supplying oxygen immediately, either from the air (once the obstruction is removed) or from higher oxygen content sources, if necessary, temporarily impaired cells can often be rehabilitated. He further opined that damage to the respiratory control center can contribute to development of respiratory infection, since normal defense mechanism is impaired. However, he found no evidence of permanent brain damage, which affected respiration or any other function, and believed the May 5 respiratory infection unrelated to the suffocation incident, since he would not anticipate totally normal findings if permanent brain damage had developed.[2]
The principal weakness in the Margiot-tas’ circumstantial evidence is that three doctors and other hospital personnel checked the child within 24 hours of the occurrence and reported entirely normal findings. In fact no medical officer at any time reported any findings which were consistent with brain damage or any other abnormality.[3] Finally, the pathologist who performed the autopsy found nothing to suggest cellular changes secondary to an-oxia, although sufficient time had elapsed for cellular reaction to take place and for even partial or moderate damage to be detected. The pathologist further testified that if permanent cellular changes had resulted from anoxia, the brain would not have appeared normal.
The trial judge found that the evidence did not establish a relationship between the child’s death and any failure to timely treat the child. We conclude that while the fact of the' child’s previous good health and the mother’s testimony of symptoms after the suffocation incident raise an inference of causal relationship, the overall evidence failed to establish it was more probable than not that the child would have lived if Dr. Trachtman had administered emergency treatment. It was at least equally probable that the restoration of oxygen by removal of the bag and the revival of breathing by striking the buttocks prevented any permanent brain damage.
The judgment is affirmed.
Affirmed.

. The neighbor verified the child’s appearance and the doctor’s behavior.

. Acknowledging the possibility of human error in testing, Dr. Terral described the electroencephalogram as an accurate technique to determine abnormalities.
There was other testimony by a general practitioner that a normal electroencephalogram is too nonspecific to absolutely rule out any brain damage.

. We accept Mrs. Margiotta’s testimony that the child sustained seizures, although these were not observed by any hospital or medical personnel. The mother’s contemporaneous reports of convulsions (at a time when she had no medical knowledge of their importance and did not anticipate wrongful death litigation) cannot reasonably be disbelieved.