CUTRER, Judge.
This is a malpractice suit by Ruby Thibo-deaux and her husband, Vernice Thibo-deaux, arising out of the death of their six-year-old son. The State of Louisiana was sued in two capacities. First, the plaintiffs sued the State through the Department of Health and Human Resources, alleging that the independent negligence of the Lafayette Charity Hospital caused the death. Secondly, the State was also sued as the employer of Dr. Thomas Bush. The plaintiffs alleged that Dr. Bush was employed by Lafayette Charity Hospital and that his negligence caused the death. Dr. *1228 Bush was also sued individually. Dr. Bush also pleads that if he is cast in judgment, such judgment and attorney fees are to be paid by the State under the provisions of LSA-R.S. 40:1299.39.[1]
The essential facts giving rise to this suit are as follows: On Friday morning, January 24, 1975, Mrs. Thibodeaux noticed numerous red spots on the body and legs of her six-year-old son, Robbie. As a result of this condition, she took Robbie to consult with Dr. Charles Atwood, a pediatrician of Crowley, Louisiana. Dr. Atwood examined Robbie. He suspected, after seeing the red spots, that Robbie had a blood disease called “thrombocytopenia.” He felt that this disease could be potentially dangerous and, after discussing the situation with Mrs. Thi-bodeaux, referred the child to Lafayette Charity Hospital for tests and treatment. Mrs. Thibodeaux immediately took the child to Lafayette Charity Hospital, where he was seen by Dr. Thomas Bush, the physician in charge of the emergency room at Charity Hospital.
Dr. Bush was a regular employee of the hospital and assigned to the emergency room. Dr. Bush stated that he observed the “petechiae,” or red spots. He had some tests run, one of which was a “platelet” estimate. This test gives the physician an idea whether the platelet count is below normal. It is not an accurate count, but only gives an indication as to whether the platelets of the bloodstream are less than normal. Upon getting the results of the test, Dr. Bush noticed that the estimate showed the platelets were “decreased” or “diminished.” He then suspected that the diagnosis was “thrombocytopenia.” He then instructed Mrs. Thibodeaux that she should take the child back home and keep him quiet over the weekend and return the following Tuesday for a consultation with a resident pediatrician in the hospital.
Mrs. Thibodeaux followed the orders of Dr. Bush over the weekend. The following Monday morning, January 27, 1975, Robbie suddenly began regurgitating blood, whereupon the plaintiffs immediately took Robbie to the emergency room of the Lafayette Charity Hospital. Upon arriving at the emergency room, the boy suddenly went into a coma. The doctors at the Lafayette Charity Hospital worked with the boy for a while that morning. A platelet count was taken which showed that the count was down to 1,000 (200,000 to 400,000 is considered normal). The boy was then transferred by ambulance to the New Orleans Charity Hospital. Robbie remained in a coma until the following Friday, January 31, 1975, at which time he expired.
A suit was filed and a jury trial was requested. Upon the trial of the case, the jury was asked to decide the liability, if any, of Dr. Thomas Bush. The independent liability of the State of Louisiana, through the Department of Health and Human Resources (Charity Hospital) and also the liability of the State of Louisiana as employer of Dr. Bush was decided by the court. The trial judge exonerated the State of Louisiana, through the Department of Health and Human Resources, or any independent liability, but held that the hospital was an employer of Dr. Bush. Dr. Bush was found to be in the course and scope of his employment at the time of his consultation and *1229 treatment of January 24, 1975, and thus the trial court held the State liable through the doctrine of respondeat superior. The jury rendered a verdict in favor of the plaintiffs and against Dr. Bush in the amount of $50,000.00. Dr. Bush was allowed to recover legal fees which he had incurred in the legal defense of this matter under the provisions of LSA-R.S. 40:1299.39, et seq. The State of Louisiana and Dr. Bush appealed from that decision.
The first two assignments of error will be consolidated for discussion, as they both raise the issue of whether the judge and/or the jury erred in their decisions of liability.
Before reviewing the testimony of the physicians who testified herein, and for the purpose of clarity, we feel it necessary to describe the medical terms and the disease referred to herein. There is no dispute as to the type of disease and the cause of death in this case. The death of Robbie was caused by cerebral hemorrhage. This hemorrhage was secondary to a condition known as idiopathic thrombocytopenia pur-pura, commonly referred to as “I.T.P.” I.T.P. is a condition wherein the human body’s own antibodies attack and kill small structures in the blood known as “platelets.” The blood “platelets” play a very important part in the body’s blood clotting process. If the number of platelets in the bloodstream is low, tiny hemorrhages will appear on the body which may be referred to as red spots, which spots are called “pe-teehiae” or “purpura.” The disease can be fatal, as was the ease here. However, a fatal result of the disease is not the usual thing. Normally, platelets have to be in the number of 200,000 to 400,000 per cubic millimeter for normal blood coagulation. When the number drops below 100,000, it then produces potentiality for bleeding.
We now turn to the medical testimony as we examine the issues of liability.
The plaintiff called four physicians, Dr. Charles Atwood, the pediatrician from Crowley, Dr. Richard Frimeaux, a general practitioner, Dr. Jacob Segura, a general practitioner, and Dr. Alfred Harmon, a specialist in family practice.
Dr. Atwood was called upon to give his opinion as to whether or not Dr. Bush was negligent in his examination and treatment. Dr. Atwood stated that when the estimate count of platelets showed a decrease, further tests were necessary in order to determine the actual count. He unequivocally stated that under the circumstances the child should have been hospitalized for further tests and kept under close observation, as this condition is deemed dangerous if the platelet count is unusually low. He felt it was below the standard of good practice to return the child to his home under these circumstances. He concluded that if the child had been kept in the hospital for a more accurate count and the count reflected that a low count actually existed, there was treatment which would have probably warded off the onset of the cerebral hemorrhage. He stated that Robbie could have been treated with continuous infusion of platelets into the bloodstream and the administration of steroids. This physician unequivocally felt that Dr. Bush was negligent in the way that the case was handled.
Dr. Richard Frimeaux was also called by the plaintiffs. He testified that he had examined the records in this case and said that the practice used in this particular case by Dr. Bush was negligent and consisted of a malpractice situation. He said that the judgment exercised by Dr. Bush was not good by any standards. He further said in another part of his testimony that Dr. Bush was blatantly negligent.
Dr. Segura, a general practitioner, examined the records in this case and commented that Dr. Bush should have asked for an accurate count after getting a decreased estimate. He also agreed with Dr. Atwood that continuous hospital tests and proper observation and treatment would have rendered Robbie’s chances of being alive more probable than not.
Dr. Alfred Harmon, who specialized in family practice and who examined the records herein, also felt that Robbie’s life could probably have been saved by hospitalization, tests and treatment as outlined by Dr. Atwood. He testified that Robbie was not *1230 given the treatment that was consistent with ordinary medical treatment given to a child with this condition in that locality.
The defendant called Dr. Charles Fonten-ot, a general practitioner. He disagreed with the plaintiffs’ doctors and said that he did not feel that Dr. Bush acted negligently. He stated that if the child had been admitted to the hospital, he felt that the outcome would have been the same.
Dr. Newell MeCallum, a pediatrician, was called by the defendant and he stated that he personally would have probably admitted the child to the hospital for the purpose of running tests and to get a more accurate platelet count. If the platelet count turned out to be low, he would also have asked for a bone marrow test. This would have given a more positive indication that I.T.P. was present. He did say, however, that if I.T.P. had been present and the child was not bleeding, he would probably have sent him home. He felt that, under the circumstances presented in this case, the outcome would have been the same even if the boy had been admitted to the hospital for tests and treatment.
The jury was faced with a difference of opinion among the doctors. It is the jury’s duty to weigh, ascertain the credibility of the expert witnesses and to render a verdict. It cannot be said that the jury committed manifest error or was clearly wrong in its decision that Dr. Bush was negligent in the manner in which he handled the treatment and examination of Robbie Thibodeaux. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Under these circumstances, the liability of Dr. Bush was correctly established.
The trial court correctly held that Dr. Bush was an employee of the Lafayette Charity Hospital and thus of the State of Louisiana. Dr. Bush testified that he worked on a salary basis for Charity. This evidence is not disputed. The trial judge correctly held that the State, through the charity hospital, was free of independent negligence as Dr. Bush had full charge of the treatment rendered to the child. The trial court properly awarded attorney’s fees to Dr. Bush under the provisions of LSA-R.S. 40:1299.39 B, supra.
The appellant urged several other assignments of error, none of which were argued in the brief, but were considered by this court, along with the review of the record, and this court finds that those remaining assignments of error are without merit.
For the reasons set forth herein, the judgment of the trial court is affirmed. Appellants to pay costs of this appeal.
AFFIRMED.

. LSA-R.S. 40:1299.39(B) provides in part as follows:
“Notwithstanding any other provisions of the law to the contrary, any health care provided (‘person’ as defined herein) acting within the course and scope of his employment, health care facility staff appointment or assignment for or on behalf of the state to any health care institution whether or not he receives compensation for such services, shall not be held liable for any amount of damages in excess of five hundred thousand dollars plus interests and costs for any injury or death of the patient due to any alleged act of malpractice within the course and scope of such employment, staff appointment, or assignment. The state shall pay any costs of legal defense and damages awarded by judgment of a court or by a compromise after institution of a suit for a medical malpractice claim or claims against such health care provider (‘person'as defined herein) not to exceed five hundred thousand dollars plus interests and costs." [Emphasis added]
(This provision was amended by Act 611 of 1978, which amendment became effective July 12, 1978. This new provision makes no substantial change.)