477 So.2d 1180 (1985)
Nelson Wayne ANTHONY, et al.
v.
HOSPITAL SERVICE DISTRICT NO. 1, d/b/a Seventh Ward General Hospital.
No. CA 84 0864.
Court of Appeal of Louisiana, First Circuit.
October 8, 1985.
Rehearing Denied November 8, 1985.
Writ Denied January 13, 1986.
*1182 John W. deGravelles, Due, Dodson, deGravelles, Robinson & Caskey, Baton Rouge, for plaintiffs-appellees Nelson Wayne Anthony & Shirley Verneuil Anthony.
H. Martin Hunley, Jr. and C. William Bradley, Lemle, Kelleher, Kohlmeyer & Matthews, and William Carruth & S. Alfred Adams, New Orleans, for defendant-first appellants Seventh Ward General Hosp. & Dr. Luis Balart.
William R. Carruth, Jr. & S. Alfred Adams, Carruth & Cooper, Baton Rouge, for Sherman A. Bernard, in his capacity as Com'r of Ins., and Louisiana Patient's Compensation Fund, intervenors-second appellants.
Before CARTER, SAVOIE and ALFORD, JJ.
ALFORD, Judge.
This is an appeal from a judgment awarding each of the plaintiffs, Nelson Wayne Anthony and Shirley Verneuil Anthony, $185,000 plus legal interest and costs for their medical malpractice claim against the defendants, Dr. Luis Balart and Hospital Service District No. 1 d/b/a Seventh Ward General Hospital, as his employer.
Plaintiffs filed a malpractice claim against the emergency room physician, the hospital, Nurse Lucille McCarter and Dr. Leo Westmoreland, a pediatrician, alleging that the negligence of these parties caused the death of their three-year-old son, Eric. Eric died of meningococcemia approximately one hour after he was admitted to the defendant hospital's emergency room on *1183 the morning of June 10, 1980. Dr. Balart, the emergency room physician, failed to examine or treat Eric after being notified by the admitting nurse, Lucille McCarter, of the child's condition. A medical review panel found that Dr. Balart's actions failed to comply with the appropriate standard of care and contributed to Eric's death. The panel exonerated Nurse McCarter and Dr. Westmoreland. Plaintiffs then pursued the instant suit against Dr. Balart, Nurse McCarter, and the hospital.
After hearing all the evidence, the trial judge found that the parents were not contributorily negligent, that the defendants had conceded Dr. Balart's negligence and that Dr. Balart's negligence was a proximate cause of the minor's death. The plaintiffs were awarded $10,000 each for the child's pain and suffering and $175,000 each for wrongful death. There was no judgment rendered in regard to the alleged negligence of Nurse McCarter. We affirm in part, amend in part and remand to the lower court for action on the question of the nurse's separate negligence and the hospital's liability therefor.[1]
Mrs. Anthony and her mother took Eric to the emergency room of the hospital prior to 4:50 a.m. on June 10, 1980. Eric had started running a fever on the afternoon of June 9, 1980, and his mother treated him with Tylenol in accordance with the standing instructions of his pediatrician. Late in the evening he drank some milk and vomited shortly thereafter. This did not alarm Mrs. Anthony since Eric had always vomited whenever he ran a slight fever and drank milk.
That same evening, Mrs. Anthony was informed that a cousin had been hospitalized that day with meningitis. Earlier in the day, she had been notified that the cousin had a rare blood disease. Eric and his cousin had been together for a short period of time on Friday, June 6, 1980. Both Mr. and Mrs. Anthony testified they were unaware that meningitis was highly contagious.
Mrs. Anthony put Eric to bed and stayed with him until after midnight. At that time he was sleeping normally. Shortly before 3:00 a.m., she noticed that he had dark spots that looked like broken blood vessels under one of his eyes and by his mouth, and that he had fever. She called the defendant hospital at about 3:15 a.m. and told the person who answered about Eric's condition and that he had a cousin hospitalized with meningitis. She was told to come to the hospital and that there would be a doctor waiting. At this time, Eric was talking and was rational.
When they arrived at the hospital, sometime before 4:50 a.m., Eric's condition was the same, except he complained of being cold. Nurse Lucille McCarter, the emergency room's licensed practical nurse, placed Eric in a treatment room and had an aide take down basic information. Mrs. Anthony again explained about Eric's condition and about his hospitalized cousin. She told the nurse that Dr. Rolling was treating the cousin, and asked to see a doctor. At that time Eric was awake and breathing normally, but he was crying and in pain.
Nurse McCarter noted that black spots were present on the child. Since she felt the child was seriously ill, she immediately called her supervisor to come down and called Dr. Balart, who was sleeping upstairs. She explained the physical condition of the child to him. Dr. Balart told her to call Dr. Rolling, which she did. She was referred to Dr. Rolling's partner, Dr. Westmoreland. She called him and reiterated the child's symptoms. Dr. Westmoreland ordered some laboratory tests and a throat culture and told her he was coming to the hospital immediately. Following notification of the doctors, Nurse McCarter returned to the treatment room. Eric was awake and talking at that time. At about 5:20 a.m., Nurse Mitchell, who was Nurse McCarter's supervisor, started Eric on oxygen because of the child's gray skin color. He actively fought the oxygen mask, just *1184 as he did the taking of his temperature and the blood samples.
Dr. Balart had not come down to the room at this time, and the nurses left temporarily to attend to other emergency room patients. During their absence, Eric's condition worsened rapidly, and he started breathing erratically even with the oxygen. At approximately 5:30 a.m., Eric stopped breathing. Eric's grandmother sought help from a former employee of the hospital who was visiting in the emergency room. She began mouth-to-mouth resuscitation and called in a "code blue" which indicates a patient has gone into cardiac or respiratory arrest. Shortly thereafter, Dr. Balart appeared and undertook additional emergency procedures to try to revive Eric, including intubating him and attempting to start an IV. A few minutes later, Dr. Westmoreland arrived and joined in the effort to save Eric. At 6:00 a.m., the doctors and nurses abandoned their efforts and Eric was pronounced dead.

LIABILITY
Dr. Balart contends that the trial court erred in improperly applying LSA-R.S. 9:2794(A)(3). He does not contest the finding of negligence on his part. Instead, he contends that the plaintiff must prove that his act of negligence caused the child to die when the child would not have died otherwise; and that the testimony of plaintiffs' experts failed to meet the burden. Section (A)(3) provides that once negligence has been found on the part of the physician, "that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
Louisiana jurisprudence does not require the plaintiff to prove absolutely that the child would have survived had it not been for Dr. Balart's negligence. Past cases have looked to the medical testimony of experts to determine whether it is more probable than not that the person would have survived had proper diagnosis and/or treatment been rendered. Thibodeaux v. State, Louisiana Health and Human Resources Administration, 371 So.2d 1227 (La.App. 3d Cir.1973); Margiotta v. Trachtman, 310 So.2d 151 (La.App. 4th Cir.1975).
In Hunter v. Office of Health Services, Etc., 385 So.2d 928, 933 (La.App. 2d Cir. 1980), writ refused, 393 So.2d 737 (La. 1980), the court stated,
To sustain their burden of proof under the circumstances as here presented, plaintiffs should only have to show by believable evidence, that the erroneous diagnosis caused Mrs. Hunter to fall from the category of persons who would statistically have been expected to survive to the category in which there was almost no chance of survival. This is all that could reasonably be expected of plaintiffs. To prove that she would not have died otherwise is an unreasonable burden.
In its written reasons, the trial court found that,
Had the appropriate emergency measures been instituted at or shortly after Dr. Balart was first notified by Nurse McCarter, the child probably would have been saved. At the very least, the child, at the time Dr. Balart was first notified by Nurse McCarter, had a substantial chance of survival estimated by Dr. Ronald Bombet to be 50% and by Dr. Robert Younes to be between 40% and 60%, which testimony the court finds to be the most credible on the point and which the court accepts.
It is well settled jurisprudentially that the trial judge's findings of fact should not be disturbed on appeal, absent a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). It is largely a matter of fact for the trial court to determine the credibility and reliability of testimony by expert witnesses, thus a finding in this regard will not be overturned unless it is manifestly erroneous and has no reasonable basis. King v. Taylor, 428 So.2d 897 (La.App. 1st Cir.1983).
*1185 Although there is a difference in the opinions of the medical experts presented, there was sufficient competent testimony upon which the trial judge could reasonably base his decision. Dr. Bombet testified that given the child's physical condition, Eric's chances would have been at least 50% had Dr. Balart started treatment when Eric was presented at the hospital. Dr. Younes placed the child's chance of survival upon presentment at 40 to 60 percent, had he been appropriately treated. One of the defendant's experts, Dr. Westmoreland, testified that medical literature shows a mortality rate of 15 to 20 percent for meningococcemia, which translates into an 80 to 85 percent survival rate. Although all of the defendant's experts testified that they believed the child could not have been saved when he was presented because of the severe infection, they did agree that the child's chances would have been better if he had been treated before going into shock. The record shows that the child went into shock sometime between presentment and 5:30 a.m., a time period of approximately 40 minutes.
Therefore, we find that the judge's determination that Eric would probably have survived had proper treatment been initiated immediately upon presentment is not manifestly erroneous and affirm his judgment as to the defendants' liability.

EXPERT TESTIMONY
Dr. Balart also contends the court erred in refusing to accept him as an expert because he is a party in the suit. His expert testimony was offered on proffer. A trial judge has much discretion in determining whether to qualify a witness as an expert and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. Brown v. Morgan, 449 So.2d 606 (La.App. 1st Cir.1984). At the time of trial, Civil Code art. 2282 (1984) provided that a witness with an interest in the suit was not considered to be incompetent, but that the circumstances might diminish the extent of his credibility. Thus, an interested party could testify as an expert. Hebert v. Brazzel, 393 So.2d 135 (La.App. 3d Cir.1980), writ granted, 394 So.2d 1234 (La.1980), aff'd, 403 So.2d 1242 (La.1981). Therefore, Dr. Balart's expert testimony offered on proffer has been given proper consideration on appeal, along with other expert testimony on behalf of the defendants.
A review of Dr. Balart's testimony shows that he reiterates the position of the defendants' other experts that Eric stood no chance of survival when presented, because of the overwhelming infection. On cross examination, he admitted he believed that Dr. Westmoreland ordered the lab tests with the expectation that they would be useful in the treatment of the child. He also stated he did not quibble with Dr. Westmoreland's opinion as to the 15 to 20 percent mortality rate for meningococcemia even though he had read it was higher. After carefully reviewing Dr. Balart's testimony, we do not feel that his testimony in any way changes or affects the trial court's findings as to his liability.

QUANTUM
Defendants allege the trial court abused its discretion in awarding survival action damages and in awarding excessive wrongful death damages. The trier of fact has much discretion in the assessment of damages awards. Civil Code art. 1934(3)[1984]. Before an appellate court can disturb a trial court award, the record must clearly reveal an abuse of discretion. Only after finding that the lower court has abused its much discretion can the appellate court modify the award, and then only to the extent of lowering it to the highest point or raising it to the lowest point which is reasonably within the lower court's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
A trial court is within its much discretion in awarding damages for pain and suffering where there is the smallest amount of evidence of pain on the part of the deceased by his actions or otherwise. Marceleno v. State, Dept. of Highways, *1186 367 So.2d 882 (La.App. 2d Cir.1978), writ denied, 369 So.2d 1364 (La.1979). In the instant case the record reveals that Nurse McCarter testified that the child was in pain at the time of presentation. Additionally, his mother testified that as his condition worsened, he began "breathing bad". She also stated that the person who drew blood from him "went from one arm to another about three or four times, repeatedly, trying to get blood." The child was awake, crying and fighting at the time. Therefore, we find that the trial court did not abuse its discretion in awarding such damages.
As to the excessiveness of the award, we do not find the $10,000 award to each parent to be an abuse of the trial court's discretion. Factors to be considered in assessing quantum for pain and suffering are the severity and duration thereof. Buckley v. Exxon Corp., 399 So.2d 1225 (La.App. 3d Cir.1981). Damage awards in other cases involving comparable injuries serve only as aids in determining whether a particular award is so grossly disproportionate to awards for truly similar injuries or losses that an abuse of discretion is thereby shown. Temple v. Liberty Mutual Ins. Co., 336 So.2d 299 (La.App. 1st Cir. 1976), writ denied, 339 So.2d 23 (La.1976).
The court reasoned that the child suffered needlessly and unnecessarily for 60 to 65 minutes prior to death. A review of cases shows that awards of $10,000 to $20,000 for pain and suffering for a short duration have been upheld. See Cathey v. Bernard, 467 So.2d 9 (La.App. 1st Cir.1985); Taylor v. Charity Hospital of Louisiana, 466 So.2d 736 (La.App. 4th Cir.1985); Bishop v. Shelter Ins. Co., 461 So.2d 1170 (La. App. 3d Cir.1984), writ denied, 465 So.2d 737 (La.1985). Therefore, we are unable to say that an award of $10,000 to each parent is grossly disproportionate to prior awards.
Defendants also claim the $175,000 wrongful death award to each parent is excessive. They allege that the plaintiffs did not prove an exceptionally close relationship with the child which would help support such an award.
The trial court stated in its reasons for judgment that plaintiffs "enjoyed an exceptionally close and warm family relationship with this child;" however, the record only supports a normal relationship. While the record shows that the mother broke down during questioning, the only testimony adduced was that the mother loved her son and that the father felt they had a good family relationship. Plaintiffs also entered a photo album into evidence without comment. The album contains normal family snapshots.
All cases that we examined whereby a plaintiff received in excess of $100,000 for the loss of one child, including those relied on by the trial court, contained abundant testimony of an unusually close or unique relationship between the child (often an adult child) and his parent or parents. In some cases, the parent relied on the child for emotional and/or financial support. See Holmes v. State, Through Dept. of Highways, 466 So.2d 811 (La.App. 3d Cir. 1985); Lang v. Prince, 447 So.2d 1112 (La. App. 1st Cir. 1984), writ denied, 450 So.2d 1309 and 450 So.2d 1311 (La.1984); Johnson v. Folse, 438 So.2d 1137 (La.App. 1st Cir.1983); Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir. 1983), writ not considered, 437 So.2d 1135 (La.1983); Pawlak v. Brown, 430 So.2d 1346 (La.App. 3d Cir.1983), writ denied, 439 So.2d 1072 (La.1983); Bullard v. State, Dept. of Transportation, 413 So.2d 606 (La.App. 1st Cir.1982).
We have considered the good relationship that the record supports in the instant case, and examined other recent cases which dealt with normal rather than exceptionally close family ties. In Palermo v. Allstate Ins. Co., 415 So.2d 437, 448 (La.App. 1st Cir.1982), the court awarded the father a total of $100,000 for the loss of his two sons, after it considered the "close relationship between the father and sons." In Guillot v. Fisherman's Paradise, Inc., 451 So.2d 568 (La.App. 1st Cir.1983), the court on rehearing awarded $50,000 to each parent *1187 for the wrongful death of their two-year-old son. The record in that case contained little evidence of the nature of the relationship between that plaintiff and their sons, and the court assumed their relationship to have been a normal one. In Cadierre v. Duet, 461 So.2d 598 (La.App. 1st Cir.1984), the court awarded $75,000 to each parent for the loss of their 17-year-old son, based on their uncontradicted testimony that the plaintiffs enjoyed a good and close relationship with their son.
While these cases are not controlling, we find that the instant case does not offer any facts that would support a higher award than $75,000. Accordingly, we modify the awards made in this case by reducing them to $75,000 for each parent.
The judgment as previously rendered limited the defendants' personal liability to $100,000. Plaintiffs seek to have the judgment modified to provide that the said defendants are liable for interest and courts costs over and above $100,000. There is no merit to their request. A health care provider is not liable for an amount in excess of $100,000 for all malpractice claims because of injury or death to any one patient. LSA-R.S. 40:1299.42 (B)(2). Therefore, under this statute, a health care provider is not liable for interests and costs over $100,000. Forstall v. Hotel Dieu Hospital, 429 So.2d 213 (La. App. 4th Cir.1983), writ denied, 433 So.2d 1054 (La.1983).
For the foregoing reasons, we modify the total awards made in this case by reducing them to the principal sum of $85,000 for each parent, and amend the judgment to reflect this reduction. We remand to the lower court for action of the question of Nurse McCarter's separate negligence. In all other respects the judgment is affirmed.
Final court costs are to await the outcome of the remanded portion of this case.
AMENDED IN PART, REMANDED IN PART AND AFFIRMED IN PART.
NOTES
[1] Plaintiffs have asked this court to find Nurse McCarter liable with the other defendants for Eric's death. We cannot consider this request since there has been no ruling by the trial court.