CHEHARDY, Chief Judge.
Hazel Berthelot Pizani instituted this suit for medical malpractice against Dr. John I. Cranmer, a urologist, West Jefferson General Hospital, and the Purdue Frederick Company, the manufacturer of a chemical which was used during a bladder operation on the plaintiff.
Prior to suit, pursuant to the Louisiana Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq., a 3-member medical review panel was formed to evaluate plaintiff’s claim. The panel concluded that neither the doctor nor the hospital failed to meet the applicable standard of care and that the conduct of which plaintiff complained was not a factor in her injuries.
Thereafter plaintiff instituted this suit in the district court. She requested a trial by jury. A bifurcated trial was necessary because the hospital is owned and operated by Hospital Service District No. 1 of the Parish of Jefferson and in accordance with LSA-R.S. 13:5105, a jury trial is prohibited against political subdivisions of the state. Consequently the jury was called upon to determine the liability, if any, of the doctor and the drug manufacturer, and the liability of the hospital, if any, was to be determined by the judge.
At the conclusion of plaintiff’s case the manufacturer made a motion for a directed verdict as to its liability. The motion was granted and the suit was dismissed with prejudice as to that defendant. The case was continued against the doctor and the hospital.
Following trial on the merits the jury returned a verdict of no negligence on the part of the doctor. The trial court found the hospital was negligent and that its negligence was a proximate cause of plaintiff’s injuries.
Accordingly, judgment was rendered in favor of plaintiff against West Jefferson General Hospital in the sum of $65,000 general damages, and $42,864 in special damages, with interest from date of judicial demand. By amended judgment it was provided that interest was to run from November 14, 1980, the date of mailing the complaint to the Commissioner of Insurance by certified mail.
The hospital has appealed from this judgment and plaintiff has answered the appeal.
*136 The record reflects the following facts:
In 1980 Mrs. Pizani consulted Dr. Cranmer for bladder problems. She had been urinating hourly in large volumes, and involuntarily while standing, sneezing or coughing. She had had a previous bladder problem in 1977 following a hysterectomy, but following treatment by her gynecologist, Dr. T. Richard Smith, the matter had resolved itself.
When consulted in 1980 Dr. Cranmer prescribed a drug which proved ineffective. When plaintiffs condition did not improve she was admitted to West Jefferson General Hospital on September 14, 1980 for diagnostic tests. It was determined that plaintiff’s bladder capacity was below normal and there was a loss of the urethral bladder angle. Cranmer recommended a surgical procedure known as a Marshall Mar-chetti Krantz (MMK), which would suspend the bladder at an angle and enable plaintiff to retain urine. The surgery was performed on September 22.
Following the operation plaintiff continued to have bladder spasms, and on the fourth or fifth post-operative day the doctor performed a second cystogram test to determine why Mrs. Pizani was not improving. The test indicated plaintiffs bladder was irritated and its capacity was substantially reduced. The doctor was at a loss to understand what had happened. In carefully reviewing the procedure and returning to examine the operating room he was of the opinion that the probable cause of plaintiffs problems was that Betadine Scrub, instead of Betadine solution which he had called for, had been injected into plaintiffs bladder, causing the irritation and the subsequent shrinking of plaintiffs bladder capacity from a low-normal 275 cc’s to 60 cc’s, or 2 ounces.
Dr. Cranmer consulted Dr. Rodney Ap-pell, a urologist with a subspeciality of urodynamics. He explained the problem and his conclusion was that it had probably resulted from injection of the wrong chemical. Dr. Appell conducted a series of uro-dynamic tests on plaintiff utilizing a variety of medications in various dosages and groupings.
Plaintiff continued to complain of the need to urinate frequently. Appell was of the opinion that this was due to irritation of certain nerve endings of the bladder. He recommended a procedure whereby a 6% solution of Phenol would be injected into the base of the bladder. This procedure involves minimal risk and has a 50% success rate in reducing irritability of the nerve endings. If successful this would completely relieve plaintiff’s frequency problems. Plaintiff is considering the procedure, but is reluctant to undergo a procedure which would instill another chemical in her bladder at this time.
She continues to consult Dr. Appell and her bladder capacity now is approximately what it was when she initially consulted Dr. Cranmer in 1980. However, she urinates every 2 or 3 hours.
It is plaintiff’s position that during the MMK procedure Betadine Scrub, a mixture of Povidone-Iodine with a detergent additive, was instilled into her bladder instead of the proper solution, Betadine and saline (50% each), to distend the bladder during her surgery. She claims the stronger solution permanently damaged her bladder. Both solutions were manufactured by the Perdue Frederick Company and sold to the hospital in gallon containers. The hospital transferred the chemicals to smaller properly sterilized glass containers. Each of the smaller bottles was marked to show the contents.
It is conceded that the doctor called for Betadine solution, and not Betadine Scrub during the operation.
In this court the hospital contends the trial court erred in finding: (1) the improper solution was used, and (2) that the instillation of either solution into plaintiff’s bladder was responsible for her injuries.
Relative to appellant’s first contention, plaintiff, the doctor and four hospital employees were present in the operating room during the MMK procedure. The employees were the circulating nurse, Sumeta *137 Yokyongskul, and three operating room technicians, Regina Allen, Linda Bocage and Theodore Johnson.
Dr. Cranmer testified that prior to the surgery 3 tests were performed on plaintiff, a cystourethoscopy, a cystogram, and a bilateral ultragram pylogram. The test results indicated her kidneys were normal, the bladder capacity was 275 cc’s, she had no urethral reflex, and she had a loss of vessel bladder angle which was contributing to her stress incontinence.
Since the bladder angle was too straight, the urine flowed out easily. If the urethra were elevated near the bladder neck, it would tend to hold the urine in. The MMK surgery was intended to elevate the bladder angle. The operation also elevates the sides of the bladder to give it additional support.
During the procedure a Betadine solution is injected to distend the bladder. It is used for color contrast between clear fluid or water, and also for its anti-bacterial effect. The Betadine solution is mixed with normal sterilized salt water. It comes from a sterile, small bottle poured into a sterile metal pan, and the Betadine solution is poured into the same pan. The hospital staff prepares the mixture during the operation!
Dr. Cranmer was standing by the staff as they made and poured the mixture. He saw it poured, but did not inspect the solution. He asked for Betadine solution and supposed that is what he got. He transferred the mixture from the pan to the bladder by means of a 2-ounce plastic syringe. He did this 3 or 4 times so that 6 to 8 ounces were injected into the bladder. The solution was left in until the doctor was able to dissect the bladder free from its attachments to the pelvic wall. The bladder was then emptied and sutures were put in. There were no problems during surgery.
The testimony of the circulating nurse (Mrs. Yokyongskul) is that she has no recollection of plaintiff’s operation. She does not recall what solution Dr. Cranmer called for, but indicated that if she were in the room at the time she would be the person to prepare the solution. However, she was not in that room at all times.
She stated that Betadine Scrub and Beta-dine solution are contained in different bottles in the operating room and they are marked with separate labels. The bottles supplied by the hospital are the same size and are differentiated only by the labels, which are applied by the hospital employees.
If the doctor were to ask for Betadine solution the procedure is to check the label on the bottle and show the bottle to the scrub nurse. The scrub nurse is the one who has the sterile gown and gloves and she cannot touch the bottle. The circulating nurse then pours the solution into the sterile basin.
All of the operating room personnel identified Betadine solution as having a darker color and a thinner consistency than Beta-dine Scrub. The scrub contains a detergent and has a foaming action. The scrub, when mixed with water, usually bubbles.
The witness suggested the doctor should be able to tell the difference between the solutions by squeezing the bulb syringe. Mrs. Yokyongskul stated the doctor, the scrub nurse and the circulating nurse check each other as a normal operating procedure and they all know the difference in appearance and density of the two solutions.
Theodore Johnson, a surgical technologist, was pinch-hitting in the operating room for about 20 minutes during plaintiff’s operation for Ms. Allen. The solution had already been prepared by someone else before he arrived. He identified the solution he saw as Betadine solution, half and half mixed with normal saline. It was in a stainless steel surgical pan. Johnson stated he remembered the case and had the solution been Betadine Scrub he would have been able to tell the difference.
Regina Allen, the operating room technician, stated she is part of the sterile field. In that capacity people bring solutions to her, and she in turn works with the physician. She does not remember this particu *138 lar case, but stated she knows the difference in the solutions, and had she been given the wrong solution in all likelihood she would have noticed. She does not know what was in the bottles or who filled them on the day of the surgery.
Linda Bocage is the only one of the hospital employees who has any recollection of plaintiff’s operation. It is her duty to pull the supplies needed for each case. She gets this information from a card the doctor provides as to the instruments and supplies he requires. She recalls Dr. Cranmer calling for Betadine solution. She handed it to the scrub nurse Regina Allen. The witness did not prepare the solution. She showed Ms. Allen the solution from out of the bottle before filling the basin. Ms. Allen read the label to be sure she was getting what she asked for, and then Ms. Allen had to add water to it in the basin.
The solution asked for was Betadine solution. She gave that to the scrub nurse and checked the bottle first. The bottles are the same, except for the label. She is familiar with the differences in the solution and remembers pouring the proper solution in the pan before handing it to the scrub nurse who added saline.
From testimony of the hospital employees and the doctor, they are all aware of the difference and appearance of the two solutions and there is no testimony that the doctor called for and received anything other than Betadine solution, which is what he asked for at the time of the operation.
The only testimony as to the use of Beta-dine Scrub is that of Dr. Cranmer and Dr. Appell. Cranmer concluded 3 or 4 days after the operation that the post-operative problems plaintiff was experiencing were probably due to instilling a Betadine Scrub solution, instead of the proper solution, into plaintiffs bladder. Dr. Appell agrees with this conclusion because the scrub has detergent qualities.
The medical review panel arrived at a different conclusion. Dr. Alvin Merlin testified on behalf of the panel. The panel consisted of 3 board certified urologists— one selected by plaintiff, one by defendant, and the third selected by both of the other physicians.
The panel reviewed the hospital chart, the depositions of Mrs. Pizani, Dr. Cranmer, Dr. Appell, Regina Allen, Linda Bo-cage, and Theodore Johnson. They also reviewed the medical records of plaintiff at Hotel Dieu Hospital, where she was treated by Dr. Appell after her release from West Jefferson Hospital.
The panel considered that the issue they were called upon to determine was whether or not the instillation of Betadine Scrub was the cause of plaintiffs damage. They unanimously concluded it was not.
They took the position that even if Beta-dine Scrub mixed with saline had been used it would not violate the standard of care and that it was not the cause of plaintiffs injuries.
The panel members themselves had used this solution on many occasions in many patients’ bladders without causing any kind of problem. They had used the scrub and saline as a way to cut down bacteria counts in patients who had indwelling catheters for a long time, and 500 to 1,000 people in hospitals over a 2V2-year period of time where the solution had been used. To Dr. Merlin’s knowledge, there were no adverse reactions.
The doctors conceded that plaintiff had some kind of adverse reaction. It could have been the solution, the catheter, the sutures, the stitches or the medications, or it could have been due to an idiosyncratic reaction of a patient to a particular product — for example, some people are highly allergic to penicillin. This does not mean the product itself is not fit for the purpose' intended, but rather that some people have unusual reactions to all kinds of medications, substances and devices.
Considering all of the evidence before them the panel members unanimously concluded that the instillation of Betadine Scrub into plaintiff’s bladder was not the cause of her problems and that the hospital and the doctor did not breach any kind of standard of care.
*139 Nothing in the operative dictation, or note, or deposition of anyone indicated that anything had been done which did not meet the standard of care in the community. Since the panel could find nothing different or wrong in the procedure, it felt no one should be held accountable.
On the basis of all of the evidence the jury found no negligence on the part of Dr. Cranmer, and that Dr. Cranmer’s negligence was not a cause in fact of plaintiff’s injuries.
The trial judge found the hospital negligent. In reasons for judgment he stated that when plaintiff entered the hospital her bladder was of normal capacity and that after the surgery her bladder had shrunk significantly. He was impressed with the testimony of Drs. Cranmer and Appell, particularly with Cranmer’s conclusion that there was a “very good possibility” that Betadine Scrub was inserted into plaintiff’s bladder causing it to shrink from 275 cc’s to 60 cc’s. Dr. Appell also believed scrub placed in the bladder reduced its size.
The court found the insertion of Betadine Scrub into plaintiff’s bladder was the cause of her present medical complaints and that employees of the hospital handed Dr. Cranmer Betadine Scrub instead of the Betadine solution he had requested.
The court concurred with the jury’s finding that Dr. Cranmer was not negligent during the performance of the surgery. Accordingly the court found West Jefferson General Hospital’s negligence was the sole cause in fact of plaintiff’s injuries.
We have discussed in detail the medical evidence, in particular that of the medical review panel which was contrary to that of the trial court, and the evidence of the hospital employees relative to the solution which they claim to have given the doctor.
The purpose of expert testimony is to assist the court. The opinion of the medical experts is not conclusive and is to be weighed by the trial judge the same as any other evidence. Kramer v. Johns-Manville Sales Corp., 459 So.2d 642 (La.App. 5th Cir.1984); Tebbe v. Avegno, 435 So.2d 513 (La.App. 4th Cir.1983); Davenport v. McCullough Services Baroid Div., 388 So.2d 453 (La.App. 2d Cir.1980); Guidry v. Davis, 382 So.2d 250 (La.App. 3d Cir.1980).
After making his own evaluation the trial judge may accept or reject an opinion expressed by any medical expert, depending on how impressed he is with the qualifications, credibility and testimony of that expert. He is obligated to evaluate the testimony of a medical witness according to the same rules applicable to other witnesses. Boudreaux v. Boudreaux, 447 So.2d 1237 (La.App. 5th Cir.1984); Newitt v. Hospital Corp. of Louisiana, 417 So.2d 391 (La.App. 5th Cir.1982).
It is well settled that where the testimony of the expert witnesses differ, the court is to determine the most credible evidence, and a finding of fact in this respect will not be overturned unless manifest error appears in the record. Guidry v. Davis, supra; Matirne v. Wilson, 336 So.2d 960 (La.App. 4th Cir.1976).
The trial judge clearly disbelieved the testimony of the hospital employees that the doctor received Betadine solution and accepted the testimony of Drs. Cranmer and Appell, two qualified urologists, as opposed to the findings of the medical review panel. After a careful examination of the record we can find no manifest error in his or the jury’s conclusions.
We now direct our attention to plaintiff’s answer to the appeal.
Plaintiff contends: (1) Dr. Cranmer’s conduct during surgery fell below the appropriate standard of medical care; (2) the court erred in rendering a directed verdict in favor of Purdue Fredrick Company; (3) the quantum is inadequate; and (4) she complains of certain evidentiary rulings.
We find no merit in appellee’s first contention. There is no showing made that the operation was performed in a negligent manner. We have discussed the operative procedure and the medical evidence earlier in this opinion and have found no manifest error in the jury’s finding that Dr. Cranmer was not negligent.
*140 Nor do we agree that Purdue Fredrick should not have been granted a directed verdict at the conclusion of plaintiffs case. There is no showing that the Betadine solution or the Betadine Scrub were in any way defective for the purpose intended. Plaintiff suggests it was negligent for the manufacturer not to put a warning on its gallon containers that the contents should not be poured into smaller bottles.
The manufacturer sold the solutions in various size bottles and the hospital purchased the gallon size containers. The manufacturer had no control over the purchaser’s subsequent determination to pour the contents into a smaller, more useable size, and in any event, it would be the duty of the purchaser to properly mark any other containers into which the contents were transferred. There is no evidence the Be-tadine solution or the Betadine Scrub is a poisonous solution.
Relative to the issue of quantum, the trial court awarded plaintiff $65,000 in general damages and $42,864 in special damages.
It was stipulated that plaintiffs past medical expenses amounted to $16,845, and her past wage loss was $26,019. These sums equal the $42,864 award for special damages. Thus we are concerned here only with the $65,000 award for general damages.
Appellee suggests the award should be increased to $650,000 as the lowest reasonable amount to which plaintiff is entitled.
We therefore look to the testimony of Mrs. Pizani and her husband as to the extent of her injuries.
The Pizanis have been married for 18 years. Prior to the surgery she enjoyed dancing, movies, football games and the like. The bladder problems began after her hysterectomy in 1975 when she consulted her gynecologist Dr. Smith. She also had gas on her stomach and consulted Dr. Cameron, an internist. When she had urinary problems shortly thereafter she consulted Dr. Cranmer.
After her surgery by Dr. Cranmer she was in great pain. The urine was coming from the bladder and the catheter. The problem continued for 7 days, during which she had severe pain, burning sensation and all kinds of reactions. The following week she had the same reaction. She was voiding constantly every 15 minutes and was unable to sleep. This lasted 10 days, until Dr. Cranmer ordered a second cystogram.
At the conclusion of that procedure the doctor told her the bladder had shrunk. Her husband insisted Dr. Cranmer find someone else to treat her and at that time the doctor consulted Dr. Appell.
Instead of being sent by ambulance from West Jefferson to Dr. Appell’s office, plaintiff was discharged, and she and her husband had to drive to New Orleans and try to find Dr. Appell’s office. It was very painful for her to walk, and they had no idea where to find the office. When they did reach this doctor, he took x rays and showed her pictures which indicated her bladder was now the size of a quarter. The doctor did a number of painful tests and a catheter had to be inserted in her bladder 3 or 4 times a day for 2 days. Thereafter plaintiff ran to the bathroom all night and had to wear diapers.
West Jefferson Hospital was supposed to carry out Dr. Appell’s orders, but plaintiff was not improving, so she was discharged from that hospital and went to Hotel Dieu, the hospital with which Dr. Appell was associated. She stayed one week and was on all kinds of medications. One side of her bladder was scarred and nothing could be done about that, and the other side was very sore. She left Hotel Dieu with 10 prescriptions and has been taking 26 pills a day since discharged. She was voiding every 15, 20 or 30 minutes.
Plaintiffs condition gradually improved after about 6 months so that she would void every one-half or one hour. At that time she reduced her visits to every 2 or 3 months to Dr. Appell. Another cystogram was performed in 1981 and she has been back and forth 7 times since the original surgery, for various procedures (tests) performed by Dr. Appell.
*141 Mrs. Pizani has had all kinds of allergic reactions to some of the medications. Her face would swell at times and she would get sores and scabs. She also went to Meadowcrest Hospital in 1982 for 2 days to remove a stone, at Dr. Appell’s suggestion.
Plaintiff was unable to work for 2 years after the accident, but was able to return to work on September 13 or 14, 1982 with her doctor’s permission. In March 1984 she was still having problems going to the bathroom and being unable to pick up heavy books and records.
She returned to Meadowcrest for 3 days where Dr. Appell did a balloon catheter procedure to stretch her bladder. The procedure took 6 hours.
At the time of trial plaintiff was voiding every hour or 1½ hours and at least 3 times per night. She is still on medication which gives her side effects, such as sore throat, nausea, dries her mouth and makes her dizzy at times.
It is established that she has a 24-year life expectancy and will be on medication for the rest of her life. She contends the only activities she can participate in at this time is dining out and that her sex life has gone down hill since the original operation.
Mrs. Pizani planned to retire in September 1985 because of her problems, although she had intended to work several more years until her husband also retired. She was 51 years old at the time of trial and was going to work until age 62. She earned $1,225 per month.
We have discussed Mrs. Pizani’s problems in detail because she does have serious permanent problems which were not corrected by surgery, and which were increased thereafter.
However, in reviewing the factual findings of the trial court in a medical malpractice case it is well settled that the findings of fact should not be disturbed on appeal absent a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979); Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1st Cir.1985).
Plaintiff asks for $490,000 for pain and suffering; $104,943 for future wage loss; and $36,000 for future medical expenses, in addition to the stipulated $42,833 for past lost wages and medical expenses. As indicated earlier she was awarded a lump sum of $65,000.
While plaintiff claims to have retired 11 years earlier than planned, there is no medical evidence that she is unable to work at this time. Her retirement appears to have been voluntary and not health related. It is established that plaintiff will require medicines for the rest of her life and will need to be examined several times a year. Plaintiff has not borne the burden of proof as to the cost of those future medical expenses.
We are cited to the case of Conti v. Ford Motor Company, 578 F.Supp. 1429 (E.D.Pa.1983), where the jury awarded plaintiff $650,000. That court found the award for a neurotic bladder resulting in complete and permanent loss of urinary control necessitating self-eatherterization 6 or 7 times per day or night for the rest of her life.
We have reviewed the Conti case and nowhere in that case has the court discussed in detail the plaintiff’s physical condition, the number of hospitalizations, the treatment, or anything of that nature. The award was discussed in 3 brief sentences, which, in the absence of a detailed discussion of a verdict of that magnitude, we find unpersuasive and of little help in the instant case.
Appellee has cited no Louisiana cases involving similar injuries, nor have we been able to find any.
However, under our jurisprudence a court of appeal can modify a damage award only after finding that the trial court abused its discretion and then only to the extent of lowering the award to the highest point or raising the award to the lowest point which is reasonably within the trial court’s discretion. LSA-C.C. art. 1934. Anthony v. Hospital Service Dist. No. 1, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
*142 We find that the trial court award is not excessive, but neither is it so inadequate as to warrant judicial intervention.
As to the evidentiary rulings complained of in appellee’s answer to the appeal, since we agree with the trial court findings of negligence on the part of the hospital it is unnecessary to discuss the- fact that Dr. Cranmer was not permitted to testify as to his opinions of the hospital’s procedures.
The court also refused to permit the doctor to testify as to his opinion about the manufacturer’s dispensing of these chemicals. However the testimony is in the record by proffer.
The question appellee wanted Dr. Cranmer to answer was whether it was a good idea to take the solution from large bottles and put them in smaller bottles. The testimony was originally concerned with the operating room procedure of the hospital.
However, plaintiff now claims the proffer of Dr. Cranmer’s testimony should be considered against the Purdue Fredrick Company in deciding whether or not the directed verdict was manifestly erroneous. We have considered the question and determined that it was not.
Appellee objected to a ruling by the trial court which prohibited Marie Malborough, the West Jefferson General Hospital operating room supervisor, who was not present at any time during this operation, from testifying as to whether the manufacturer’s representatives were aware of the hospital’s procedure for dispensing Beta-dine solution and Betadine Scrub.
According to the proffer she would have testified the salesmen probably were aware that the hospital removed the solutions and scrub from the original manufacturer’s containers and poured them into smaller bottles.
This testimony is nothing more than guessing and speculation and was properly excluded for that reason. Taylor v. Roach, 302 So.2d 327 (La.App. 1st Cir.1974). Such testimony has no probative value and would have been prejudicial to the manufacturer if admitted in evidence.
Had this evidence been admitted, we can see no negligence on the part of the manufacturer for actions of the hospital over matters in which the manufacturer had no control, so as to render the manufacturer liable in the instant case.
It is also contended that she should have been able to testify relative to the manufacturer’s failure to warn the operating room staff against this procedure.
We are not dealing here with poisonous material and plaintiff has made no showing that the manufacturer was in any way responsible for the actions of the hospital. See Andries v. General Motors Corp., Delco, 444 So.2d 1180 (La.1984).
We have considered the proffer and are unable to find that the directed verdict was erroneous.
Since we have determined there was no negligence on the part of the manufacturer it is unnecessary to discuss the issue of prescription.
For the reasons assigned the judgment appealed from is affirmed.
AFFIRMED.