647 So.2d 1366 (1994)
Margaret TODD, et al., Plaintiffs-Appellants,
v.
F. Clark SAULS, et al., Defendants-Appellees.
No. 94-10.
Court of Appeal of Louisiana, Third Circuit.
December 21, 1994.
*1369 Joseph Texada Dalrymple, Alexandria, for Margaret Todd, et al.
Victor Herbert Sooter, Alexandria, for Rapides Regional Medical Center, et al.
Before KNOLL, THIBODEAUX, COOKS, SAUNDERS and WOODARD, JJ.
KNOLL, Judge.
This is a medical malpractice appeal which involves negligent treatment of postoperative wound infections and monitoring of the patient's nutritional status after repeat coronary artery bypass surgery. James Todd, the patient, remained hospitalized and died approximately one month after the surgery.
Margaret Todd, the widow of the decedent, and his seven adult children initiated this wrongful death and survival action against Dr. F. Clark Sauls, decedent's treating cardiovascular surgeon,[1] contending that Dr. Sauls committed medical malpractice. After the jury returned a verdict finding the evidence failed to preponderate that Dr. Sauls was negligent, the trial court rendered judgment in favor of Dr. Sauls, dismissing plaintiffs' action.
*1370 The Todds appeal asserting that the trial judge erred: (1) in improperly instructing the jury that the conduct of Dr. Sauls, a treating cardiovascular surgeon, was governed by the locality rule; (2) in instructing the jury that plaintiffs had the burden of showing through the testimony of physicians licensed in the State of Louisiana that Dr. Sauls deviated from the standard of care; and (3) in giving competing instructions which were contradictory and one of which was inapposite to the case sub judice. We reverse, finding that the jury was improperly instructed, review the case de novo, and render judgment in favor of the Todds.

FACTS
In 1984, Dr. Denton Cooley, a cardiac surgeon in Houston, performed coronary artery bypass surgery on Mr. Todd. His treating cardiologist was Dr. Louis Leatherman. In 1988, Dr. Tuncay Ertan, an internist, referred Mr. Todd, who was 55 years of age, to Dr. Sauls to perform a repeat coronary artery bypass because the bypasses performed in 1984 were failing. Mr. Todd was admitted to Rapides General Hospital on October 3, 1988, and on October 4, 1988, Dr. Sauls performed bypass surgery. Toward the end of surgery, Dr. Sauls inserted an intra-aortic balloon pump to assist Mr. Todd as he was weaned from the cardiopulmonary bypass pump.
Postoperatively while in intensive care, Mr. Todd sustained a heart attack which left his heart weakened. On October 5th, the day following surgery, the intra-aortic pump was removed and surgical incisions (fasciotomies) were made on either side of Mr. Todd's left calf to relieve the swelling and tension in the lower extremity of the left leg because the blood supply to Mr. Todd's lower left extremity was decreased due to the use of the pump.
Mr. Todd remained in intensive care until the afternoon of October 5th when he was moved to a private room on the floor which was equipped with telemetry equipment to monitor his heart and vital signs. During the following days, Mr. Todd ambulated very little, had episodes of fever, and ate almost nothing. From October 3rd to October 20th, Mr. Todd suffered a weight loss of 19½ pounds. On October 20th, a heart function test (MUGA) showed that Mr. Todd's heart was working at only an 8% level; normal heart function is at 50% or better. Because his condition continued to deteriorate, Dr. Sauls returned Mr. Todd on October 21st to intensive care. On October 23rd, Dr. Ertan started giving Mr. Todd the antibiotic methicillin for treatment of a staph infection at the chest tube site. Finally, on October 25, 1988, at the request of the family, Dr. Ertan, with the concurrence of Dr. Sauls, arranged for Mr. Todd's transfer to St. Luke's Hospital in Houston, Texas. At St. Luke's, Dr. Louis Leatherman, a specialist in internal medicine and an invasive cardiologist, treated Mr. Todd's heart condition. Dr. Barry D. Zeluff, an infectious disease specialist, examined Mr. Todd's infected surgical wounds and prescribed antibiotic treatment. Upon admission to St. Luke's, every one of Mr. Todd's surgical wounds was infected. Despite Mr. Todd's care at St. Luke's, he died from cardiac arrhythmias on November 2, 1988.
Subsequent to Mr. Todd's death, his wife and children timely submitted a medical malpractice claim contending that Dr. Sauls failed to meet the applicable standard of care. On August 19, 1991, the medical review panel, composed of Drs. Bernard Kaplan, Larry Leyser, and Curt Smith, rendered an opinion that the evidence failed to support the Todds' contention that Dr. Sauls breached the applicable standard of care. The Todds then initiated this lawsuit in district court. After hearing the evidence, the jury, in a 10 to 2 vote, found that the Todds failed to prove by a preponderance of the evidence that Dr. Sauls breached the standard of care owed Mr. Todd.

JURY INSTRUCTIONS
The Todds contend that the jury was improperly instructed that the standard of care which Dr. Sauls, a medical specialist, owed to Mr. Todd was a local standard of care, instead *1371 of a national standard of other like specialists. They argue that the jury should only have been instructed that the Todds had the burden of proving the degree of care ordinarily practiced by physicians within the same medical specialty as Dr. Sauls and that as a result of Dr. Sauls' failure to exercise this degree of care, Mr. Todd lost his chance of survival.
Adequate jury instructions fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. The instructions must properly reflect the law applicable in light of the facts of the particular case. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5 Cir.), writ denied, 434 So.2d 1097 (La.1983). The mere discovery of an error in the trial court's instructions does not automatically justify a de novo review by the appellate court without first measuring the gravity or degree of the error and considering the instructions as a whole and the circumstances of the case. The manifest error standard may not be ignored unless the jury charges are so incorrect or so inadequate that the jury was precluded from reaching a verdict based on the law and the facts. Barnett v. New Orleans Public Service Inc., 489 So.2d 452 (La.App. 4 Cir.1986).
When a jury is erroneously instructed and the error probably contributed to the verdict, the verdict must be set aside on appeal. Smith v. Travelers Insurance Company, 430 So.2d 55 (La.1983). Only then should the appellate court make an independent determination of the facts from the record, if possible, without according any weight whatsoever to the factual findings of the erroneously instructed jury. The manifest error rule is not to be used when the jury's factual findings favorable to the prevailing party have been tainted. Picou v. Ferrara, 483 So.2d 915 (La.1986).
In the case sub judice, the trial judge instructed the jury as follows:
"The standard of care required of every health provider, except the hospital, in rendering professional services or health care to a patient shall be to exercise that degree of skill ordinarily employed under similar circumstances by the members of his profession in good standing in the same community or locality and to use reasonable care and diligence along with his best judgment in the application of his skill.
In a malpractice action based on the negligence of a licensed physician, such as Dr. F. Clark Sauls, the plaintiff has the burden of proving first the degree of knowledge and skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the State of Louisiana and actively practicing in a similar community or locale and under similar circumstances and where the defendant practices any particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty. The degree of care ordinarily exercised is the degree of care that the physician gave his other patients when he performed this procedure."
It was not disputed that Dr. Sauls is a board certified cardiovascular surgeon and that the appropriate standard of care should have been for a specialist rather than the "locality" standard. Measured against that fact, it is clear that the trial judge gave competing instructions on the issue of the standard of care which Dr. Sauls owed. Considering the trial judge's insertion of Dr. Sauls' name in that part of the sentence which referred to non-specialists and the locality standard, we find that the jury was misled by that juxtaposition. Accord, see Leyva v. Iberia Gen. Hosp., No. 94-C-0795 (La. 10/17/94) 643 So.2d 1236.
When the erroneous jury instructions are considered with the issue of medical malpractice to be determined by the jury, we find the following observations extremely significant: (1) all three of the Todds' medical experts were from outside Louisiana; and (2) all *1372 seven of Dr. Sauls' medical experts were from Louisiana, and of the seven, six were local doctors practicing in Alexandria. Thus we find that the trial judge's reference to "similar community or locale" standards only heightened the differentiation presented by the Todds' reliance on their three out-of-state doctors as opposed to the defendant's seven Louisiana doctors (six of which were local). We further find that this differentiation misled the jury.
In an attempt to ameliorate the effect of the locality instruction, Dr. Sauls points to the numerous references the Todds made during voir dire examination and again in closing argument in which their attorney asked the jury not to prefer local doctors to their out-of-state medical experts. Two factors convince us that these references did not cure the trial judge's error. First, Dr. Sauls emphasized the distinction between his local experts and the Todds' reliance on out-of-state experts. Second, as part of his jury instructions, the trial judge specifically told the jury:
"Of what does the evidence consist? Unless you are otherwise instructed, the evidence that you are to consider consists of the testimony of the witnesses, the documents if any that have been admitted into evidence and any fair inferences and reasonable conclusions which you can draw from the evidence submitted to you. Neither the written pleadings nor arguments by the lawyers or any comment or ruling which I have made is evidence."
As we place all of this into perspective, we finally point out that the attorney for the Todds told the jury that the trial judge would instruct them on the applicable law. When the trial judge instructed the jury, he stated, "It now becomes my duty to tell you the law that applies to this case and it is your duty ... to follow the law." Accordingly, we do not find that the reference by the Todds' attorney to the specialist rule could possibly countermand the jury's perception that they were duty-bound to follow the trial judge's instructions regarding the law. Therefore, we find that the jury was effectively prohibited from assessing and weighing the expert medical testimony presented by the Todds.
Because of our analysis hereinabove, we find that the erroneous jury instruction tainted the jury's factual findings, and we are compelled to set aside the jury verdict. In accordance with well accepted jurisprudence of this state, Smith, supra; Picou, supra, we will make an independent determination from the record without according any weight to the factual findings of the erroneously instructed jury.

MEDICAL MALPRACTICE
The Todds' medical malpractice action against Dr. Sauls is based on allegations that he negligently treated infections which developed in Mr. Todds' surgical wounds, and that he failed to aggressively monitor Mr. Todds' nutritional status after coronary bypass surgery. They argue that because of these acts of negligence, the infection in Mr. Todds' wounds went unchecked and his weight dropped by approximately 19 pounds during the time that he was Dr. Sauls's patient at Rapides General. Ultimately, they contend that these medical complications deprived Mr. Todd of his chance to survive.
The plaintiff's burden of proof in a medical malpractice action against a physician is found in LSA-R.S. 9:2794(A), which provides:
"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., .. the plaintiff shall have the burden of proving:
(1) ... [W]here the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to *1373 use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
Elaborating on this statute, the Supreme Court in Martin v. East Jefferson General, 582 So.2d 1272, 1276, 1278 (La.1991), stated:
"In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained.
* * * * * *
[To] establish causation in a situation where the patient dies [as in the case of Mr. Todd], the plaintiff need only prove that the defendant's malpractice resulted in the patient's loss of a chance of survival, and that the plaintiff need not shoulder the `unreasonable burden' of proving that the patient would have survived if properly treated."
The law does not require perfection in medical diagnosis and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Iseah v. E.A. Conway Memorial Hosp., 591 So.2d 767 (La.App. 2 Cir.1991), writ denied, 595 So.2d 657 (La. 1992). When the alleged negligence of a specialist is at issue, the trier of fact looks to the testimony of those qualified in that specialty to determine the standard of knowledge, skill and care for that specialist and is not restricted to proof of the standard of care and skill within the defendant's community or locality. Stein v. Insurance Corp. of America, 566 So.2d 1114 (La.App. 2 Cir.), writ denied, 569 So.2d 984 (La.1990).
The thrust of the plaintiffs' argument is that Mr. Todd's infected surgical wounds and his malnourishment kept him from the heart transplant program, his only chance of survival. They concede that Mr. Todd's severely impaired heart did not promote healing and curtailed his appetite. However, they contend that Dr. Sauls breached the standard of care ordinarily practiced by physicians in his field when, knowing Mr. Todd's severely weakened condition, he did not aggressively treat the infected wounds and failed to take actions to nourish Mr. Todd.
It is undisputed that Mr. Todd had a severely damaged heart. He had two coronary artery bypass surgeries; he suffered at least two myocardial infarctions in his lifetime, the last one just after Dr. Sauls' surgery. The record also shows that before Dr. Sauls' surgery, the MUGA scan, a diagnostic test that measures heart performance and function, showed Mr. Todd's performance rating before surgery was 25%; sixteen days post surgery on October 20, 1988, Mr. Todd's heart performance rating had decreased to 8%. Normal performance is approximately 50%.
The medical experts who testified at trial examined the medical records of Mr. Todd's hospitalization at Rapides General and St. Luke's. Besides Dr. Sauls, Dr. Kaimal and Dr. Ertan who treated Mr. Todd at Rapides General, Dr. Barry Zeluff, an infectious disease specialist, and Dr. Louis Leatherman, a specialist in internal medicine and an invasive cardiologist, examined and treated Mr. Todd when he was transferred to St. Luke's.
Dr. Leatherman was Mr. Todd's treating cardiac specialist at St. Luke's. He testified that the infection of the wounds was a major factor which kept Mr. Todd from consideration for transplant. Commenting on the surgical wounds which he observed on Mr. Todd upon his transfer to St. Luke's, Dr. Leatherman stated that these wounds were the worst he had seen in ten years from outlying hospitals. Even considering the *1374 poor state of Mr. Todd's heart, Dr. Leatherman said that with proper wound care he should not have seen wounds which looked this bad.
In the course of trial much medical testimony was dedicated to the question of whether Mr. Todd exhibited signs of systemic infection at the time of his admission to St. Luke's. As described by the various physicians, sepsis is a generalized systemic infection as opposed to local wound infection. Dr. Leatherman testified that he made a clinical diagnosis that Mr. Todd was systemically infected at the time of his admission to St. Luke's. Medical testimony about this diagnosis was debated throughout the trial. Some of the physicians testified that they do not make a diagnosis of systemic infection without blood cultures to support that conclusion. In the present case, cultures of Mr. Todd's blood were negative for sepsis. On the other hand, medical testimony further indicated that often blood studies show a false negative because the patient will have received antibiotics prior to obtaining the blood sample. In the case of Mr. Todd, he received an antibiotic at Rapides General just before his transfer to St. Luke's. So strong was Dr. Leatherman's clinical opinion on this issue that he listed the following on the death certificate:
"OTHER SIGNIFICANT CONDITIONSCONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART 1(a): Sepsis."
We are impressed with Dr. Leatherman's opinion based on clinical findings. However, whether Mr. Todd's wounds were septic is not critical to our analysis, as the wounds were also infected with staph and some with pseudomonas, which kept Mr. Todd from being considered for a heart transplant.
Dr. Leatherman further stated that Dr. Sauls as the cardiac surgeon was responsible for monitoring Mr. Todd's surgical wounds while he was hospitalized at Rapides General. After examining Mr. Todd's hospital records, he opined that he would have become concerned about possible infection as early as October 8th, four days post-surgery. He based this opinion on Mr. Todd's continued elevated temperature and stated that this was unusual this long after surgery. His concern was later confirmed when as late as October 10th, Mr. Todd had an elevated white blood count of 15,000 and a temperature peak of 101°.
After thoroughly examining the medical records, Dr. Leatherman opined that Dr. Sauls breached the standard of care by not monitoring the wounds more closely for infection, by not initiating broad spectrum antibiotics on October 17th when he first considered that option, and by failing to obtain an infectious disease consult. Dr. Leatherman further opined that if Dr. Sauls had administered appropriate antibiotics sooner after surgery, Mr. Todd would have presented himself at St. Luke's in better health and with a greater chance of getting on the heart transplant program. In conclusion, Dr. Leatherman stated that Mr. Todd's arrival at St. Luke's in such an infected state denied him a chance for a heart transplant and the chance to survive.
In addition to Mr. Todd's infections, Dr. Leatherman further commented on Mr. Todd's nutritional status. He stated that Mr. Todd was malnourished when he arrived at St. Luke's and that tube feeding was immediately begun. Dr. Leatherman stated that Mr. Todd's negative metabolic situation had been developing for days or weeks while he was under the care of Dr. Sauls and that this problem should have been recognized and addressed before he arrived in Houston.
Dr. Leatherman stated that it was the responsibility of the surgeon and cardiologist to pay closer attention to Mr. Todd's nutritional status and to have better management of his weight. He emphasized that wounds cannot heal when a patient is malnourished. Based on Mr. Todd's steady, rapid weight loss and the failure of Dr. Sauls to attempt to reverse that loss, Dr. Leatherman further opined that Dr. Sauls deviated from the standard of care he owed Mr. Todd as his treating cardiac surgeon.
*1375 Dr. Zeluff, the infectious disease specialist that Dr. Leatherman consulted, had Mr. Todd's surgical wounds cultured on October 26, 1988, the day after his transfer from Rapides General. He testified that every wound was infected. The chest tube site grew staphylococcus aureus (staph); the groin grew staph and pseudo-monas; the sternal wound grew staph; the fasciotomy grew staph; the vein graft site grew staph and pseudomonas. He testified that both the chest wound and the site on the leg where the vein graft was harvested were coming apart at the suture line. He described purulent fluid leaking from the chest tube site and the groin wound. The fasciotomy wound on the left leg had dead tissue on it and a possible sinus tract had formed at the site of the chest tube. Dr. Zeluff stated that it takes a while for surgical wounds to deteriorate to this extent.
Dr. Zeluff stated that the surgeon is the one responsible for surgical wound care and the initiation of antibiotics. He further stated that a surgeon is fully capable of diagnosing the infections he found on Mr. Todd's wounds and that it was not necessary for a doctor such as himself, a disease control specialist, to treat the type of infections Mr. Todd exhibited.
Before reaching any conclusions about the quality of treatment Mr. Todd received, Dr. Zeluff was asked to place the issue of wound infection into the perspective of Mr. Todd's poor heart function. After considering Mr. Todd's poor heart function upon admission to Rapides General, and as further reflected that he had only an 8% ejection fraction as shown 16 days post-surgery, Dr. Zeluff stated that the heart surgeon needed to be even more mindful of the potential for infection and the need to aggressively treat it when signs of infection first appeared.
When presented with the records of Rapides General, considering Mr. Todd's temperature, white blood cell counts, and notations of the appearance of Mr. Todd's wounds, Dr. Zeluff opined that a physician should have become concerned about infection somewhere around October 7th or 8th. Instead, the record shows that Dr. Sauls first considered broad spectrum antibiotics on October 17th and it was Dr. Ertan, not Dr. Sauls, who administered the antibiotic methicillin on October 23rd or 24th for treatment of a staph infection at the chest tube site. Based on these records, Dr. Zeluff opined that Dr. Sauls deviated from the standard of care owed Mr. Todd.
Dr. Zeluff also elaborated upon the interrelationship of Mr. Todd's malnourishment and his wound infections. Speaking generally, Dr. Zeluff stated that impaired nutritional status depresses the body's immune system and adversely affects the body's ability to heal wounds. When he was confronted with Mr. Todd's 19 and ½ pound weight loss post-surgery in 17 days, he opined that Mr. Todd encountered a loss of both body mass and water and that this was not good for Mr. Todd. In response to a hypothetical fact situation based on Mr. Todd's medical records at Rapides General, Dr. Zeluff opined that Dr. Sauls further deviated from the standard of care by failing to initiate alimentation, parenterally or enterally, by at least October 20th.
Dr. Robert D. Pipkin, an expert cardiac surgeon, also testified for the Todds. Dr. Pipkin testified that he reviews medical records for attorneys in addition to his active surgical practice. He testified that approximately 80% of the cases he reviews, he finds no medical malpractice and recommends that no legal action be taken. In the present case, however, he recommended that the Todds pursue their legal action.
Dr. Pipkin emphasized that when a patient has very poor cardiac function, as Mr. Todd had, the cardiac specialist has the duty to be vigilant, pay attention to detail, and carefully monitor for infection. As an example of Dr. Sauls' failure to adhere to this duty, Dr. Pipkin referred specifically to Mr. Todd's treatment on or about October 17th and the days following.
On the 17th of October the medical records show that Dr. Sauls described Mr. Todd's left *1376 leg wound and sternum incision as being reddened and that there was drainage at the chest tube site. With those observations, Dr. Sauls considered commencement of broad spectrum antibiotics, but did not initiate such treatment because he thought that the wounds were improving.
In stark contrast to Dr. Sauls' inaction, Dr. Pipkin reviewed the medical evidence and disagreed with Dr. Sauls' perception of improvement. He opined that a continued elevated temperature through the 22nd, nurses notes of reddened incisions, blood drainage at the chest tube site, and a foul smell were indicative of infection and showed a need for the commencement of antibiotics.
Dr. Pipkin further corroborated the testimonies of Drs. Zeluff and Leatherman on the negative effect that malnourishment has on the healing process and the body's inability to fight infection. Dr. Pipkin stated that it was Dr. Sauls' responsibility to make certain that Mr. Todd received adequate calories and proteins. After reviewing the records, he found that there was a general wasting of Mr. Todd in the post-operative period as evidenced by his steady decline in weight.
With regard to Dr. Sauls' treatment of Mr. Todd, Dr. Pipkin stated that it is the responsibility of the cardiac surgeon to care for the surgical wounds and to care for the patient post-surgically. After reviewing the records from Rapides General and St. Luke's and the depositions of Drs. Sauls, Ertan, Leatherman, Zeluff, and Bernard Kaplan, Dr. Pipkin opined that Dr. Sauls deviated from the standard of care owed to Mr. Todd both with regard to wound infections and malnourishment.
The defense of Dr. Sauls' action with regard to the initiation of antibiotics is that the medical records support that his wound care of Mr. Todd at Rapides General was appropriate. Dr. Sauls stated that although he considered broad spectrum antibiotics on October 17th, he withheld the implementation of his decision because Mr. Todd's white blood count decreased to 10,000, down from 15,000, and considered it within the normal range. He likewise contended that inappropriately starting antibiotics can result in superinfection and antibiotics can cause diarrhea which would have heightened Mr. Todd's nutritional problem. Instead, Dr. Sauls said that when he saw evidence of drainage from the chest tube site on October 22nd, he had it cultured. When the culture was reported positive for staph on the following day, Dr. Ertan began giving methicillin, an antibiotic which specifically attacks staph.
We have carefully reviewed the testimony about Mr. Todd's wound treatment, paying particular attention to Dr. Sauls' testimony, and find that the medical records do not corroborate Dr. Sauls' assertions.
Dr. Sauls admitted that he was responsible for the care and treatment of Mr. Todd's surgical wounds. He further stated that he did not commonly read the nursing notes and that he instead preferred to rely on his observation of the patient.
The medical records show that on October 17th, Mr. Todd's sternotomy wound and the mid-lower left leg incision were reddened and his temperature was 99.6°. It was at this point in Mr. Todd's treatment that Dr. Sauls first considered broad spectrum antibiotics because he, as the treating surgeon, was "obviously being vigilant, obviously concerned about it, thinking about it." Nevertheless, the record shows that Dr. Sauls chose not to start antibiotics.
On the 18th Dr. Sauls noted that Mr. Todd was afebrile. The medical records, however, show that Mr. Todd had a fever of 101.2°. When Dr. Sauls reviewed the medical records at trial, he admitted that he erred when he said Mr. Todd had no fever. Likewise, although Dr. Sauls indicated no drainage in his notes, the nurses' notes show that there was drainage at the chest tube site. No white blood cell count was ordered or determined that day.
On October 19th, Dr. Sauls noted that Mr. Todd's wounds were improving and he had no fever. According to the nurses's notes, *1377 redness was noted at the surgical wounds and his temperature reached 100°. No white blood cell count was made.
Dr. Sauls made no comment in his notes on October 20th about Mr. Todd's wound status. However, the nurses' notes show that the wounds were again reddened and that Mr. Todd's temperature reached 100.8°. No wound culture was yet ordered or obtained. Nevertheless, Dr. Sauls' notes described Mr. Todd as looking and feeling very ill.
On October 21st, Dr. Sauls transferred Mr. Todd into intensive care. Although he noted that Mr. Todd was "gravely ill with profoundly depressed ventricular function," he made no mention of Mr. Todd's wound status or that his temperature reached 100.6°. The nurses' notes showed wound redness and the edges of the left leg wound are described as very red.
Dr. Sauls stated that at this point Mr. Todd's main problem with infection centered on his body's inability to circulate blood because of heart damage. Nevertheless, Dr. Sauls admitted that the predominance of the heart problem did not foreclose treatment of Mr. Todd's other problems, i.e., infection of his wounds.
On October 22nd, Dr. Sauls found Mr. Todd afebrile. The nurses' notes show that his temperature reached 100.6°. In Dr. Sauls' words, this constituted an elevated temperature and not a fever since Mr. Todd was a post-op heart patient. The nurses' notes described the chest tube site as draining foul smelling, bloody purulence. This was the first time that Dr. Sauls had the chest tube site cultured and considered starting broad spectrum antibiotics after receiving the culture report from the laboratory. It was not until the next day that Dr. Ertan, not Dr. Sauls, obtained information that the culture report of the chest tube site was positive for staph that he ordered the antibiotic methicillin administered.
Dr. Sauls further asserted that Mr. Todd's fasciotomy wound on the left leg was clean throughout his hospitalization at Rapides General. To the contrary, the nurses' notes on October 23rd describe that yellow purulent drainage oozed from the fasciotomy wound when they cleaned the incisions. In summation, Dr. Sauls noted that as per the laboratory report on October 23, the only infection Mr. Todd had at Rapides General was at the chest tube site.
We note that Drs. Larry J. Leyser and Richard P. Mansour, who both testified for Dr. Sauls, would not offer an opinion on the appropriateness of Dr. Sauls' wound care. Dr. Sauls never asked Dr. Kaimal about the appropriateness of the wound care. Drs. Ertan, James E. Knoepp and Michael K. Hill, who also testified on Dr. Sauls' behalf, stressed the need for Dr. Sauls to vigilantly watch the wounds of Mr. Todd, but stated that they thought that Dr. Sauls' treatment of the wounds was proper. Dr. Bernard Kaplan also found the wound care proper, but stated that he was not aware that the fasciotomy site was immediately debrided in Houston because of infection. In finding that Dr. Sauls' wound care was appropriate, the doctors who defended Dr. Sauls stated that elevated temperature and an increased white blood count are not uncommon in heart attack victims and that the post-operative heart attack further hindered the ability of Mr. Todd's body to ward off infection.
Dr. Sauls also contended that he properly monitored Mr. Todd's nutritional status. The record shows that Dr. Sauls ordered the nursing staff to weigh Mr. Todd daily. Based on that order, the records document the steady decline of Mr. Todd's weight. However, Dr. Sauls explained Mr. Todd's weight loss by saying that patients who have undergone cardiac surgery have no appetite for as long as several weeks to several months and sometime develop low cardiac output syndrome. The medical testimony described low cardiac output syndrome as the body's inability to continue blood flow and oxygen to the body. As a result the patient has no appetite, fluids build up in the body, wounds do not heal, and there is a marked loss of body weight. Based on this *1378 scenario, Dr. Sauls contended that feeding Mr. Todd liquid nourishment through a nasal-gastric tube or something similar was not appropriate because he was retaining fluids and added fluid intake may have resulted in congestive heart failure.
Dr. Ertan and Dr. Kaimal, both physicians who treated Mr. Todd while he was hospitalized at Rapides General, stated that they also monitored Mr. Todd's nutritional status. In fact, the record shows that they actively worked with the Todd family trying to get Mr. Todd to eat. Nevertheless, even these efforts failed and on October 20th Dr. Kaimal noted that Mr. Todd's nutritional status needed to be seriously confronted and suggested that Dr. Sauls consider supplemental feeding. Despite this, no follow up to this recommendation appears and the record is void of any action by Dr. Sauls to obtain a nutritional consult while Mr. Todd was at Rapides General.
The other physicians who testified on Dr. Sauls' behalf, except for Dr. Leyser, agreed with Dr. Sauls' decision not to begin supplemental feedings. Notwithstanding, Dr. Leyser testified that he saw nothing in the record which contraindicated tube feeding of Mr. Todd.
Unlike the physicians who examined the record and agreed with Dr. Sauls' handling of Mr. Todd's nutrition, Dr. Leatherman, who examined and treated Mr. Todd at St. Luke's, adamantly refused to blame Mr. Todd's nutritional decline and the related wound infections on low cardiac output syndrome. He agreed that Mr. Todd presented "a complicated, difficult, sequence of illnesses and problems," but that did not rule out carefully monitored supplemental feedings. Dr. Pipkin simply stated that even with low output syndrome, the fluid balances of patients such as Mr. Todd had to be watched carefully.
After carefully examining the record, we find that the evidence preponderates that Dr. Sauls breached the standard of care he owed to Mr. Todd. Dr. Sauls' testimony convinces us that he failed to aggressively treat the surgical wound infections, that he chose not to take advantage of the nurses' observations of infection, and that he allowed Mr. Todd's body weight to rapidly waste away, knowing first hand that extreme vigilance was required because of Mr. Todd's already severely impaired heart. As pointed out by the examining physicians at St. Luke's, all of Mr. Todd's surgical wounds were infected, some needed debridement, and were in a state they should not have been, even assuming Mr. Todd's severely impaired heart function.
In a like vein, Dr. Leatherman's immediate introduction of liquid nutrients at St. Luke's highlighted Mr. Todd's need for nourishment and the testimony of the Todds' experts was quite clear that Dr. Sauls should have instituted this course of action early on during Mr. Todd's hospitalization at Rapides General. The record shows the interconnection of malnourishment and infection, how they can have a deleterious effect on the heart, and how malnourishment can inhibit the body's ability to fight infection.
In making this finding, we are cognizant of the testimony on Dr. Sauls' behalf which effectively asserts that Mr. Todd was doomed when he had the heart attack after Dr. Sauls' surgery, and nothing could have reversed his outcome. Notwithstanding, we find that the record belies this assertion. To the contrary, the record shows that Dr. Sauls did not feel that Mr. Todd was in grave danger until October 20th, when he discussed the gravity of Mr. Todd's situation with the family. Before October 20th, Dr. Sauls never related to the family that Mr. Todd was doomed or in grave danger.
Between the time of Mr. Todd's post-surgical heart attack and October 20th, the date of the MUGA scan, the record does not show what Mr. Todd's heart function was. However, the testimony preponderates that malnourishment, particularly, and wound infection to a degree, adversely affect heart contractility and heart function. Thus, the very factors which form the basis for the *1379 allegations of negligence against Dr. Sauls may have precipitated Mr. Todd's decline of heart function.
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact. Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1 Cir.1985), writ denied, 480 So.2d 743 (La. 1986). A substantial factor need not be the only causative factor; it need only increase the harm. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986). In the most recent pronouncement by the Louisiana Supreme Court in Pfiffner v. Correa, Nos. 94-C-0924, 0963, and 0992 (La. 10/17/94), 643 So.2d 1228, the court stated on page 2:
"In cases where a patient has died, the plaintiff need not demonstrate `that the patient would have survived if properly treated.' Rather, he need only prove that the patient had a chance of survival and that his chance of survival was lost as a result of the defendant/physician's negligence. The defendant/physician's conduct `must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause.'" (Citations omitted).
The record is clear that Mr. Todd's only hope of survival was a heart transplant. As pointed out by Drs. Leatherman and Zeluff, both members of the transplant committee at St. Luke's, Mr. Todd's infections effectively removed him from transplant consideration. Furthermore, we find that the evidence of the doctors at St. Luke's, as well as that of Dr. Pipkin, that short of a transplant, the insertion of a LVAD (Left Ventricular Assistance Device) would have been available as an intermediate alternative had it not been for Mr. Todd's serious infections. Accordingly, we find that Dr. Sauls' medical malpractice was a substantial factor in causing Mr. Todd's result, and exacerbated an already critical condition, thus Dr. Sauls' malpractice deprived Mr. Todd of a chance of survival.
In making this determination, we are mindful that Dr. Sauls contends that Mr. Todd's problem with alcohol abuse would have precluded his consideration for a heart transplant. Although the record shows that Mr. Todd occasionally drank, the medical record fails to show that he exhibited symptoms of alcohol withdrawal at any time during his hospitalization. Thus, we find no proof of alcohol abuse to the level asserted by Dr. Sauls.

DAMAGES
Since we render judgment in favor of the Todds against Dr. Sauls, we must now determine the amount of damages to which they are entitled.

Statutory cap
Before we begin our assessment of damages, we will address the following question that we posed to the litigants when this case was resubmitted to a five-judge panel:
"If the court finds defendant, Dr. Sauls, liable for medical malpractice, does the $500,000 statutory limitation on damages apply to each claimant or does the amount apply to all claimants collectively?"
In the present case, the Todds assert in their supplemental brief that each of them has a separate claim against Dr. Sauls as a result of Mr. Todd's death. In support of their argument they assert that a similar result was reached in the jurisprudence which interpreted the damage cap provided in LSA-R.S. 13:5106 before that statute was declared unconstitutional. Accordingly, they contend that each of them may be awarded up to $500,000.
LSA-R.S. 40:1299.42(B)(1) provides:
"The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost." (Emphasis added).
In Rodriguez v. Louisiana Medical Mut. Ins., 618 So.2d 390, 393 (La.1993), the Louisiana *1380 Supreme Court provided the following procedural background on Louisiana's Medical Malpractice Act and expounded on the act:
"The total amount recoverable for all malpractice claims for injuries to or death of a patient, excluding future medical expenses and related benefits shall not exceed five hundred thousand dollars plus interest and costs. The qualified health care provider is not liable for an amount in excess of one hundred thousand dollars (plus interest thereon accruing after April 1, 1991) for all malpractice claims because of injuries to or death of any one patient. Any amount awarded from a judgment, settlement or arbitration in excess of one hundred thousand dollars shall be paid from the [Patient's Compensation] Fund pursuant to the provisions of R.S. 40:1299.44(C).
* * * * * *
The potential adverse effect of the Medical Malpractice Act is that persons most grievously injured by medical negligence are subject to reduced quantum recovery as a consequence of the cap on damages. The purported corresponding advantage is the enhanced prospect of medical personnel staying in Louisiana with the result that medical care will be more available to the citizens of the state. In addition, those injured by medical malpractice will purportedly be better off in that there will be a solvent defendant from which to pursue compensation, at the least $100,000 from the health care provider and up to an additional $400,000 from the Fund.
* * * * * *
The Legislature has thus created a special scheme of compensation for those injured by medical malpractice. In the process, the substantive caps and discreet procedures established by the Legislature were particularly detailed."
Although the Louisiana Supreme Court was not presented with the issue presently before us, we note that in Rodriguez there were multiple plaintiffs and an award in excess of $600,000 was reduced in the trial court to conform with the $500,000 statutory cap.
As asserted by Dr. Sauls, the only appellate court decision that has addressed the question we posed is LaMark v. NME Hospitals, Inc., 542 So.2d 753 (La.App. 4th Cir.), writ denied, 551 So.2d 1334 (La.1989). In LaMark, the Fourth Circuit stated at page 756:
"[W]e reject appellants' argument that LSA-R.S. 40:1299.42(B) should be interpreted as a limitation on each separate claim for a single act of malpractice, as opposed to a limitation on each separate claim for a single act of malpractice, as opposed to a limitation on the total amount recoverable for all malpractice claims for injuries to or death of a patient. If we were to accept appellants' interpretation, we would inject incalculable instability into the computation of the surcharge levied against health care providers in funding the LPCF. This instability would undoubtedly increase the surcharge, the cost of which could be expected to be passed to the patients of Louisiana. Additionally, we believe that the language of LSA-R.S. 40:1299.42(B)(1) is clear that the limitation applies to all malpractice claims, for which recovery shall be limited to $500,000 in total. The clear language of the law shall not be ignored in search of the intent of the legislature. LSA-C.C. Art. 9." (Emphasis in original; footnote omitted).
The Todds assert that LaMark is not consistent with Williams v. Kushner, 549 So.2d 294 (La.1989) and does not comport with the Third Circuit's interpretation of LSA-R.S. 13:5106's statutory cap in Ryland v. Liberty Lloyds Insurance Company, 617 So.2d 583 (La.App. 3rd Cir.1993), reversed on other grounds, 630 So.2d 1289 (La.1994), and Mitchell v. State through DOTD, 596 So.2d 353 (La.App. 3rd Cir.), writ denied, 600 So.2d 680 (La.1992).
In Williams, a case involving damages awarded to only one plaintiff, the Louisiana Supreme Court made two holdings: (1) there is no constitutional infirmity in the State's *1381 providing for payment from the Louisiana Patient's Compensation Fund of $400,000 in damages to plaintiff on behalf of his minor son, and plaintiff has no constitutional claim for a greater amount; and (2) the disparity in language between LSA-R.S. 40:1299.42(B)(1), the cap provided for medical providers in the private sector, and the similar statute with regard to malpractice claims against the state, violated the plaintiff's constitutional guaranty of equal protection with regard to awarding costs of future medical care and related benefits; in claims against the State, future medical care and related benefits could be recovered if there were claims and litigation pending when the statute was amended in 1984, whereas private sector medical malpractice claims for these items of damages could only be recovered if such claims were filed after the 1984 amendment. Based on that limited ruling, the Louisiana Supreme Court declared that portion of the private sector statute unconstitutional and reformed it to apply to claims pending when the statute was amended. After considering that ruling in Williams, we fail to see how the Todds can argue that the holding in LaMark would have been different if it had been decided after the Williams decision was rendered.
We next consider the Todds' contention that we should examine the jurisprudence that considered the statutory cap mandated in LSA-R.S. 13:5106, judgments against the State in areas other than medical malpractice.
While it is true that the Civil Code directs that laws on the same subject matter should be construed with reference to one another, it is also true that it is only when one statute is unclear that another on the same subject should be called in aid to explain it. LSA-C.C. Art. 13. Otherwise, where there is no ambiguity, the words of a statute are to be read in their most usual significance, that is, according to their general and popular use. LSA-C.C. Art. 11; see also Crescionne v. La. State Police Retire. Bd., 455 So.2d 1362 (La.1984).
We decline to compare the wording of the medical malpractice cap on damages to interpretations that this court has given to the provisions of LSA-R.S. 13:5106 before the cap provided therein was declared unconstitutional. Looking at the wording of the medical malpractice cap on damages, we find the wording clear and unambiguous. Out of an abundance of caution, we have reviewed the legislative history of the Medical Malpractice Act. In examining the debate of the act, we found nothing to support that the cap is per plaintiff. When a patient dies because of one individual's act of medical malpractice on one patient, the total amount recoverable for all malpractice claims against that one tortfeasor shall not exceed $500,000 plus interest and costs. LSA-R.S. 40:1299.42(B)(1).
To construe the act to mean that the cap is per plaintiff is to misread the act. The act clearly states: "The total amount recoverable for all malpractice claims ... a patient..." (emphasis added). We emphasize the words "total," "all claims," and "a patient." This is clear, unambiguous language. The clear quantifiers are "a patient" as well as "total amount recoverable" and "all malpractice claims."[2] Whether there is one or eight plaintiffs is of no moment. The physician's negligence is not multiplied by the number of plaintiffs. In the case sub judice, the cap is applied per patient, not per plaintiff. This rationale is no different than applying insurance limitations in nonstatutory cap cases. The only difference is that in a medical malpractice action, the legislature imposed the cap for policy reasons; in the private sector, an individual contracts with an insurance company and the contract is controlling as to the limits of liability, not the number of plaintiffs. For example, see Remedies *1382 v. Lopez, 560 So.2d 118, 120-21 (La. App. 3d Cir.), writ denied, 563 So.2d 1155 (La.1990).
When we examine the various statements of the Louisiana Supreme Court on the purpose of Louisiana's medical malpractice cap, Rodriguez, supra, we find that if we applied multiple caps as espoused by the Todds, we would interfere with the special scheme of compensation crafted by the Louisiana Legislature and upset the soundness of providing a solvent fund which the Legislature sought to insure for the citizens of this State in the enactment of this legislation. Further, it would also be a misinterpretation of the clear wording of the act. Accordingly, we find that a single $500,000 cap applies collectively to those claims which flow from Mr. Todd's death to Mrs. Todd and her major children because of Dr. Sauls' act of medical malpractice.

Wrongful death
The elements of damage[3] of wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614 (La.App. 1 Cir.), writ denied, 515 So.2d 1111 (La.1987). In the present case, Mr. Todd was retired from the railroad before his surgery and no evidence of a loss of support appears in the record. We likewise find no proof of loss of services for which an award can be made.
It was not disputed that Mr. Todd's funeral expenses amounted to $4,975, and his medical expenses, as adjusted by agreement in the record to exclude purely cardiac costs, at St. Luke's amount to $19,533.42.[4] Judgment will be granted in these amounts.
We also award damages to Mrs. Margaret Todd, the wife of Mr. Todd for 33 years, for the loss of her husband and his love and affection. Though they at one time had a brief period of marital difficulties, the record preponderates that they had a close loving relationship, did many activities together, and were close to their seven children. For the loss of her husband's love and affection, we award Mrs. Margaret Todd the sum of $150,000.
We also award damages to Mr. Todd's seven major children. The record shows that the children and Mr. Todd enjoyed being together in their adult years, that they visited frequently, and that they did many activities together. We award the sum of $50,000 in general damages to each of Mr. Todd's children for the loss of their father's love and affection.
In our notification of counsel that this case was being resubmitted to a five-judge panel, we also asked that they address the following question:
"If the court finds the defendant, Dr. Sauls, liable for medical malpractice should damages be awarded for loss of survival or for wrongful death?"
Our research has failed to find any jurisprudence which has directly addressed our question. We note, however, that in the recent case of Ambrose v. New Orleans Police Department Ambulance Service, et al., No. 93-C-3099, 93-C-3110, 93-C-3112 (La. 7/5/94), 639 So.2d 216, the Louisiana Supreme Court made the following statement in footnote 4:
"This Court has at least twice addressed loss of a chance of survival. In Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986), we held that it was unnecessary for plaintiff to prove that the patient would have survived had proper treatment been given. Rather, plaintiffs had the burden to prove that the patient had a chance of survival and that the improper treatment caused a loss of that *1383 chance. In Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991), we held that the plaintiff did not have to shoulder the burden of proving that the physician's malpractice was the cause in fact of the patient's death, but rather that the physician's malpractice resulted in loss of chance of survival. Our Court has not yet addressed the proper measure of damages to be awarded where a plaintiff has proven only the loss of a chance of survival." (Emphasis added).
In the present case, the record establishes that the Todds proved damages other than just Mr. Todd's loss of a chance of survival. Accordingly, we find it appropriate to only award those elements of damages referred to hereinabove that are traditionally awarded in wrongful death actions. Moreover, even if we were inclined to make a separate damage award for Mr. Todd's loss of a chance of survival, the record is void of evidence which would quantify that element of damages.
Since the damages for loss of love and affection have exhausted the medical malpractice cap, we will not award survival damages, but do recognize plaintiffs' entitlement to them.
For the foregoing reasons, IT IS ORDERED, ADJUDGED, AND DECREED that the judgment of the trial court is reversed and set aside and that there be judgment herein in favor of Margaret Todd and against Dr. F. Clark Sauls in the amount of ONE HUNDRED SEVENTY FOUR THOUSAND FIVE HUNDRED EIGHT AND 42/100 ($174,508.42) DOLLARS, together with legal interest from date of judicial demand until paid, and for all costs of trial and these appellate proceedings.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Barbara Todd Parker, Donna Todd Duffell, Nancy Todd Rachal, James Deral Todd, William Todd, Kenneth Ray Todd, and Susan E. Todd, and against Dr. F. Clark Sauls in the amount of FIFTY THOUSAND AND no/100 ($50,000) DOLLARS, each, together with legal interest from date of judicial demand until paid, and for all costs of trial and these appellate proceedings.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the liability of Dr. F. Clark Sauls is subject to his limit of liability of $100,000 plus legal interest as provided by LSA-R.S. 40:1299.42, and that pursuant to statute the Commissioner of Insurance of the State of Louisiana, upon receipt of a certified copy of this judgment, is ordered to pay all sums up to the statutory maximum of $500,000 and to comply with the provisions of LSA-R.S. 40:1299.44(B).
REVERSED AND RENDERED.
SAUNDERS, J., dissents without reasons.
THIBODEAUX, J., will dissent in part with written reasons on the issue of the medical malpractice cap.
COOKS, J., will dissent in part for the reasons assigned by THIBODEAUX, J.
NOTES
[1] Rapides General Hospital, the treating hospital, and a number of other defendant-doctors who treated Mr. Todd were dismissed from the lawsuit before the case was presented to the jury and are not involved in this appeal.
[2] The query, if any, is not whether the cap is per plaintiff, but whether it is per doctor when there are multiple doctors involved. We note with interest that this issue is presently pending on writs before the Louisiana Supreme Court in Turner v. Massiah, No. 94-CA-29 (5th Cir. July 1, 1994), 641 So.2d 610. Since the case sub judice involves only one physician, Dr. Sauls, and one deceased patient, James Todd, we will not engage in dicta on an unrelated issue.
[3] Mindful of the $500,000 cap on medical malpractice damages, we have tempered our assessment of these awards in accordance with this limitation.
[4] There was no evidence in the record of expenses from Rapides General which the Todds claimed.