# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-1581


**JAMES PICKERING, ET AL.**

**VERSUS**

**DR. DALMACIA PARAGUYA, ET AL.**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 99-3668
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, Jimmie C. Peters, Marc T. Amy, and J. David Painter, Judges.


**AMY, J., DISSENTS AND ASSIGNS WRITTEN REASONS.**

                                    **REVERSED AND RENDERED.**

James R. Shelton
Durio, McGoffin, Stagg & Ackermann
Post Office Box 51308
Lafayette, LA 70505-1308
Telephone: (337) 233-0300
COUNSEL FOR DEFENDANTS/APPELLEES:
    St. Paul Fire & Marine Insurance Company and Dr. Dalmacia
    Paraguya

Edmund M. Thomas
6104 Line Avenue - Suite 4
Shreveport, LA 71106
Telephone: (318) 219-9888
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    James Pickering, et al.

**Todd A. Townsley**
**The Townsley Law Firm**
**3102 Enterprise Boulevard**
**Lake Charles, LA 70601**
**Telephone: (337) 478-1400**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
**James Pickering, et al.**

**THIBODEAUX, Chief Judge.**

Sherry Breaux, the daughter who represents the deceased plaintiff-appellant, James Pickering, asserts that the trial court erred by giving a wrong jury instruction regarding the applicable standard of care in this medical malpractice suit against an endocrinologist, Dr. Dalmacio Paraguya, and his insurer, St. Paul Fire & Marine Insurance Company. After a trial, the jury found that Dr. Paraguya did not breach the standard of care he owed to Mr. Pickering. We disagree. We reverse and set aside the trial court's judgment because we find that the jury charge was erroneous and impacted the jury's decision. After a de novo review of the record, we conclude that Dr. Paraguya committed medical malpractice which resulted in Pickering's loss of a leg, and we enter a judgment in favor of Ms. Breaux for Mr. Pickering's medical expenses, $500,000.00 for Mr. Pickering's loss of his leg, and legal interest.

I.

**ISSUES**

We shall consider whether in this medical malpractice suit against a specialist, the trial court gave an erroneous instruction to the jury that contributed to the jury's verdict, where: 1) the trial court, after the jury's request for clarification on the question of the applicable standard of care, directed the jury to apply the standard of care physicians exercise in this locale; 2) the defendant, who was the plaintiff's treating physician, testified as an expert, and the trial court instructed the jury to accord more weight to the testimony of the treating physician; and, 3) the defendant had only Louisiana experts, while all of the plaintiff's experts were from out-of-state.

After finding that the trial court committed a legal error that warrants a de novo review of the record, we shall consider whether the specialist committed

medical malpractice in treating Mr. Pickering for diabetic foot ulcers, who lost his leg because of a gangrenous infection. If so, we shall determine Mr. Pickering's damages, where he was under fifty years of age, underwent several operations, and endured severe physical and emotional pain.

II.

## FACTS

Mr. Pickering entered Moss Regional Hospital in March of 1996 because of an ulcer on the bottom of his right foot. When he later left the hospital, he began treatment of his foot ulcer and his underlying diabetic condition with Dr. Paraguya, a board certified endocrinologist. According to Dr. Paraguya, he instructed Mr. Pickering to stay off of his feet, except to go to the restroom or to eat, to follow a strict diet, to take his medications, and to come to all doctor appointments. Mr. Pickering's son testified that Mr. Pickering complied with these instructions.

Based on Dr. Paraguya's records, Mr. Pickering's pressure ulcer was improving over the course of several visits to his office. Paradoxically, Dr. Paraguya scheduled a surgical debridement of the ulcerous area. Dr. Paraguya did not prescribe any mechanical device to off-load the pressure from the ulcer.

By his July 18, 1996 appointment, Mr. Pickering developed a second ulcer in the heel area on his right foot. The original ulcer, based on Dr. Paraguya's records, was improving. Dr. Paraguya prescribed an ointment for both wounds, did not order surgical debridement, and asked Mr. Pickering to return six weeks later, on August 29, 1996.

When Mr. Pickering returned on August 29th, he reported nausea, vomiting, and fever. Dr. Paraguya's records from the visit indicated that the original ulcer continued to improve, but the ulcer on the heel remained unchanged. Dr.

2

Paraguya ordered the continued use of the antibiotic ointment and prescribed medication for the nausea.

While Dr. Paraguya reported no changes in the heel ulcer, Mr. Pickering's son testified that, by the time of the August 29th visit, the heel ulcer had increased in size and was a "pusy, mucusy sore." The son also reported an odor from the foot.

Eight days later, Mr. Pickering was admitted to Moss Regional Hospital for the treatment of a gangrenous right foot. Dr. Walter Ledet surgically debrided the heel ulcer on September 8, 1996. His operative report described the gangrenous infection all the way down the bony structures of the mid arch of the foot, continuing all the way around the ankle. Dr. Shakil Sandozi, who amputated Mr. Pickering's leg on September 10, 1996, testified that Mr. Pickering's wound had been infected for weeks.

Mr. Pickering had to undergo several surgeries and endured severe physical pain. After the amputation, Mr. Pickering's quality of life severely declined, and he became very depressed, immobile, and struggled with phantom pain. Because he had difficulties with using a prosthetic limb, he was confined to a wheelchair, and his depression caused him to seclude himself in his house. Mr. Pickering gradually deteriorated until his death in 2001.

Mr. Pickering's daughter, Ms. Breaux, was substituted as the plaintiff in Mr. Pickering's medical malpractice suit against Dr. Paraguya. At trial, none of the expert witnesses Ms. Breaux called to testify as to the standard of care applicable in this case was from Louisiana. Dr. Paraguya and another doctor from Lafayette, Louisiana, Dr. Maurice Sullivan, testified as experts for the defense. Before Ms. Breaux's witnesses testified, the trial court charged the jury that it could give

3

whatever weight it wanted to the expert's testimony, based on the witness' training and expertise. Yet, when it was Dr. Paraguya's turn to testify, the trial court directed the jury to give more weight to Dr. Paraguya's testimony because he was Mr. Pickering's treating physician.

Ms. Breaux's experts testified, relying on endocrinology textbooks, that the national standard of care applicable to endocrinologists included, at the very least, off-loading from the wound, proper debridement of the dead tissue, and close follow-up and monitoring of the wound. Thus, according to Ms. Breaux's experts, Dr. Paraguya breached this standard of care when: 1) he did not prescribe a device—a wheelchair, a cast, or crutches—that would off-load the pressure from the ulcer; the heel ulcer was probably the result of this failure; 2) he did not surgically debride the dead tissue and prescribed ointment instead; this, in turn, prevented an accurate assessment of the true condition of the heel ulcer; and, 3) he failed to closely monitor the ulcers by allowing six weeks to elapse between the date of the discovery of the second ulcer on July 18, and the next visit on August 29.

The defense submitted its own exhibits that specified the same basic principles on the standard of care, i.e., the need for off-loading, debridement, and close monitoring. Dr. Paraguya along with Dr. Sullivan, who was not an endocrinologist but an internal medicine specialist who failed his internal medicine board exam three times, testified as experts for the defense. They stated that even as of 1999 there were no widely-accepted guidelines for treatment of diabetic foot ulcers. The above principles, according to the defense, were simply suggestions at the time Dr. Paraguya treated Mr. Pickering. Thus, the doctor prescribed the care he found appropriate, based on the condition of the ulcers.

4

The defense also submitted into evidence the opinion of the Medical Review Board (MRB). The MRB relied on Dr. Paraguya's notes of the unchanged appearance of the heel ulcer on August 29. The MRB concluded that Mr. Pickering was not septic as of that date, and, therefore, Dr. Paraguya did not breach the standard of care.

At the end of the trial, the trial court explained that Ms. Breaux was required to establish by a preponderance of the evidence "that degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians practicing in the same medical specialty as that in which the defendant practices." During deliberations, the jury requested further explanation of Question #1 on the Verdict Sheet—whether Ms. Breaux proved the applicable standard of care. The trial court gave a supplemental instruction, the pertinent portion of which was as follows:

> Question number 1 is a question that is drawn from our own Revised Statute 9:2714 which is the statute governing malpractice in this case. And it reads as follows: . . . "The plaintiff must prove the degree of knowledge and skill possessed or degree of care ordinarily exercised by physicians licensed to practice in the State of Louisiana and actively practicing in similar community or locale and under similar circumstances, and whether defendant practices in a particular specialty and whether last act of medical negligence raised issues peculiar to the medical specialty involved. Then the plaintiff has the burden of proving the degree of care ordinarily practiced by a physician who treats diabetic foot ulcers within the involved medical specialty."
>
> And basically, you have to rely on the testimony of the many expert doctors that testified on both sides. You can look at other evidence in the record and you can consider what the lawyers argued to you even though it's not evidence to assist you in trying to determine whether or not the plaintiffs have proved that there is a standard of care for treating ulcers, diabetic foot ulcers in this locale and what that standard is.

5

After deliberations, the jury answered "Yes" to: "Do you find, by a preponderance of the evidence, that the plaintiffs proved the applicable standard of care owed by Dr. Dalmacio Paraguya to James Pickering." The jury responded "No" to: "Do you find, by a preponderance of the evidence, that Dr. Dalmacio Paraguya deviated from the appropriate standard of care?" This appeal followed.

III.

## STANDARD OF REVIEW

The trial court must correctly charge the jury. *Adams v. Rhodia, Inc.*, 07-2110 (La. 5/21/08), 983 So.2d 798. It is the trial court's duty that "the jury receives only the correct law." *Id.* at 804 (citations omitted). "[W]hen a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict." *Id.* "[T]he determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." *Id*. (citations omitted).

The appellate court should conduct a de novo review, giving no weight to the factual findings of the jury when the "jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts." *Id.* at 805. Thus, before the appellate court reviews the case de novo, it must first measure the gravity or degree of error, considering the circumstances of the case and the instructions as a whole. *Adams*, 983 So.2d 798.

When the trial court fails to find liability and the appellate court reverses and renders, the appellate court reviews the record de novo to determine damages. *See Ryan v. Zurich Am. Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214.

6

IV.

**LAW AND DISCUSSION**

We first evaluate whether the trial court read an erroneous instruction to the jury. After concluding that it did, we assess the gravity of the error in light of all of the circumstances of the case. Because we conclude that the jury charge was so erroneous as to prevent the jury's verdict based on the law and facts, we review the record de novo to determine whether Dr. Paraguya's actions fell below the standard of care he owed to his patient, Mr. Pickering. Finally, after finding that Dr. Paraguya is liable, we conclude that Ms. Breaux is entitled to $500,000.00, Mr. Pickering's medical expenses associated with his right leg, and legal interest.

**A) JURY INSTRUCTION**

**1) The Error in the Instruction**

Dr. Paraguya concedes that the trial court gave an erroneous supplemental instruction. His main argument is that the supplemental instruction did not contribute to the verdict. Thus, Dr. Paraguya maintains, the jury found that there was a standard of care Dr. Paraguya owed to Mr. Pickering because it answered the question regarding the standard of care in the affirmative. Dr. Paraguya argues that the jury found that he simply did not breach the standard of care he owed. We disagree.

> In a malpractice action based on the negligence of a physician . . . the plaintiff shall have the burden of proving:
>
> The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the

7

> burden of proving the degree of care ordinarily practiced
> by physicians . . . within the involved medical specialty.

La. R. S. 9:2794(A)(1).

It was a prejudicial error for the trial court to read the above statute to the jury and insert the physician's name in the portion before the semicolon, the one that refers to the local standard of care, where the defendant physician was a specialist, all of the plaintiff's experts were from out-of-state, and all of Dr. Paraguya's experts were from Louisiana. *See Todd v. Sauls*, 94-10 (La.App. 3 Cir. 12/21/94), 647 So.2d 1366, *writs denied*, 95-206, 95-219 (La. 3/24/95), 651 So.2d 289. This court also noted that any argument of the attorney in closing as to which standard of care should apply—local or national—was futile, when the judge appropriately stated to the jury that he instructed the jury as to the law and the jury's duty was to follow that law. *Id.*

In this case, the trial court's error was even more significant than in *Todd*. The supplemental instruction here was not simply a pairing of Dr. Paraguya's name with the locality standard. As in *Todd*, the trial court gave competing instructions on the issue of the standard of care by reading the entirety of La.R.S. 9:2714(A)(1). Then, instead of ordering the jury to apply the standard of care endocrinologists exercise nationally, the trial court directed the jury to apply the standard of care physicians exercise in this locale. Moreover, the court read the incorrect instruction at a significant point—when the jury wanted a further explanation of the applicable standard of care. Thus, it is even more likely here than in *Todd* that the charge misled the jury. We find that the supplemental instruction was so incorrect that even in light of the original instruction, the charge was an erroneous statement of the law.

## 2) The Error's Contribution to the Verdict

The second prong of our analysis is whether the error contributed to the jury's verdict. Dr. Paraguya argues that because "there was essentially no disagreement concerning the standard of care that would have applied to Dr. Paraguya," the standard of care is not a relevant inquiry on this appeal. Dr. Paraguya asserts that the jury heard the evidence and did not believe that the doctor breached the standard of care. Paradoxically, later in his brief to this court, Dr. Paraguya argues that contrary to the assertions of Ms. Breaux's witnesses, "there were no widely-accepted evidence-based guidelines for assessing and treating foot ulcers." We fail to see how this could be considered as "essentially no disagreement" as to the applicable standard of care.

Contrary to Dr. Paraguya's assertions that the standard of care in this case is irrelevant because the jury found no breach, whether the jury could have found a breach depended on which standard of care the jury applied. The standard of care that *requires* Dr. Paraguya to prescribe a mechanical device to release the pressure from the foot, to *surgically* remove the dead tissue from the wound, and to closely monitor the ulcer by having appointments once a week, is certainly different from the standard of care where all of the above procedures are optional.

All of Dr. Paraguya's witnesses were from Louisiana while all of Ms. Breaux's witnesses were from out-of-state. The defense witnesses testified that at the time of the incident there were no widely-accepted guidelines for treating diabetic foot ulcers, while the plaintiff's witnesses testified there were. Under these circumstances, like in *Todd*, the trial court's directive to apply the locality standard of care further tainted the jury's fact-finding process by heightening the differentiation already present by Ms. Breaux's reliance on the out-of-state witnesses.

9

As in *Todd*, we find that this directive, coupled with the trial judge's mandate to apply the law the trial judge read to the jury, in effect, prohibited the jury's consideration of Ms. Breaux's witnesses' testimony.

Although this court finds sufficient basis in the above analysis for disregarding the jury's verdict, we think that the trial court's direction to accord more weight to Dr. Paraguya's testimony because he was Mr. Pickering's treating physician, substantially magnified the impact of the trial court's erroneous instruction. This kind of instruction is only appropriate in personal injury and workers' compensation cases, where the treating physician is *not* a party.

We believe it is safe to assume that in a medical malpractice suit, a defendant physician would give exculpatory testimony regarding her or his actions. Thus, in medical malpractice cases, the instruction to accord more weight to the testimony of the treating physician, when the treating physician is on trial and testifies as an expert, allows the defendant to establish the applicable standard of care and make him or her more credible than the plaintiff's experts. That is improper.

We find no merit in Dr. Paraguya's and the trial court's assertions that Dr. Sandozi's testimony diminished the effect of this instruction because he also was Mr. Pickering's treating physician and testified favorably to Mr. Pickering. Dr. Paraguya and Dr. Sandozi, though both were Mr. Pickering's treating physicians, were not similarly situated in this case. Unlike an ordinary expert, such as Dr. Sandozi, whose financial interest in a case is limited to the fee he receives from the party, a defendant physician, testifying as an expert, has a direct financial and professional stake in the *outcome* of the case. Dr. Sandozi's testimony does nothing to diminish or neutralize Dr. Paraguya's interest in the outcome of this case so as to make the instruction less erroneous or less harmful.

10

Based on these considerations, we conclude that the erroneous instruction given to the jury by the trial court prevented the jury from rendering a proper verdict based on the law and facts. Accordingly, we shall conduct a de novo review of the record giving no consideration to the factual findings of the erroneously-instructed jury.

## B) MEDICAL MALPRACTICE

### 1) Dr. Paraguya's Breach of the Standard of Care

After a careful review of the record, we find that Dr. Paraguya breached the standard of care applicable to endocrinologists. Ms. Breaux had several distinguished experts, including an endocrinologist, a podiatrist, and a vascular surgeon. They all testified that the standard of care applicable at the time Dr. Paraguya treated Mr. Pickering required the treating endocrinologist, at the very least, to off-load the pressure from the diabetic foot ulcer via some mechanical device, to surgically debride the dead tissue, and to closely monitor the wound.

The essence of Dr. Paraguya's and Dr. Sullivan's testimony was: 1) that a mechanical device to relieve the pressure had its danger, i.e., that the patient would be tempted to walk more, thereby increasing the pressure; 2) that the prescription of an ointment debrider instead of the surgical one did not breach the standard of care; and, 3) that on July 18, Mr. Pickering's foot appeared to be improving, and, therefore, the month and a half period between appointments satisfied the requirement of close monitoring.

Ms. Breaux's experts testified that the inevitability of the patient's walking on the affected foot and the patient's loss of peripheral sensation are precisely the reasons why the endocrinology textbooks instruct the doctor to use a mechanical device to relieve the pressure from the foot ulcer. In fact, Ms. Breaux's

11

expert endocrinologist testified that because Dr. Paraguya did not adequately off-load Mr. Pickering's foot, Mr. Pickering most likely walked on his heel to keep the weight from his original ulcer, thereby developing the second ulcer.

Furthermore, because Dr. Paraguya's own records indicated that on July 18, 1996, Mr. Pickering had necrotic tissue around the ulcer, Dr. Paraguya should have used surgical debridement. This would have allowed the identification of what was underneath the surface. Ms. Breaux submitted evidence that a visual examination of the ulcer is often insufficient because the ulcer, despite its outwardly benign appearance, can be much larger in its depth. For this reason, we cannot rely on Dr. Paraguya's visual assessment of the wounds which, in Dr. Paraguya's estimate, required no surgical debridement. Dr. Paraguya may not fail to diligently examine underneath the surface of the wound and then claim release from liability because of this self-imposed ignorance of the true condition of the ulcer.

Finally, to allow six weeks to elapse between the appointments is anything but close monitoring. All of Ms. Breaux's witnesses testified that close monitoring in this case meant doctor visits at least once a week. Even Dr. Paraguya's own witness, Dr. Sullivan, testified that six weeks between visits was not "close monitoring." Though Dr. Paraguya's records revealed that the original ulcer improved, by the June 18, 1996 appointment, Mr. Pickering had developed a second ulcer on the same foot. Dr. Paraguya asserted that Mr. Pickering's "pedal pulses were not palpable, meaning he had severely restricted arterial flow to his feet—putting him at risk for foot ulcers and complications arising from them." Thus, Dr. Paraguya, aware of the dangers associated with Mr. Pickering's diabetic foot ulcers, aware of Mr. Pickering's new ulcer, again breached the standard of care he owed to Mr. Pickering by scheduling his next visit a month and a half later.

## 2) Dr. Paraguya's Breach Caused Pickering's Damages

Although Dr. Paraguya argues he did not breach the standard of care, we believe that his main argument is that his breach did not cause Mr. Pickering's damages. Thus, he asserts that his records indicated that, as of August 29, 1996, Mr. Pickering's original ulcer had improved and his heel ulcer remained unchanged. Therefore, Dr. Paraguya maintains, Mr. Pickering's foot problems that required the emergency room visit on September 6, 1996, occurred after August 29, 1996. In essence, Dr. Paraguya argues that what he did or failed to do prior to the August 29 visit is irrelevant because Mr. Pickering's ulcers were not deteriorating as of that date. Thus, Dr. Paraguya asserts, the jury believed his account of the condition of the ulcers on August 29 and not Mr. Pickering's family members, who testified to the oozing and the odor of the heel ulcer.

As explained above, we do not give any deference to the findings of fact of the erroneously-instructed jury. There is an abundance of evidence in the record to support the causation element in this case. Although Dr. Paraguya focuses on the condition of the foot on August 29, 1996, that date is only one of several relevant dates in this case. Thus, although the condition of the foot on August 29, 1996, is important and is disputed, we emphasize that Dr. Paraguya's failure to properly off-load Mr. Pickering's foot *prior* to August 29, 1996, probably caused the heel ulcer to appear in the first place. Moreover, while Dr. Paraguya surgically debrided the initial ulcer, which was, in fact, healing, *prior* to August 29, 1996, he failed to surgically debride the heel ulcer, which ultimately started the infection process, resulting in Mr. Pickering's loss of his leg.

Furthermore, because a foot ulcer can be much larger and deeper despite its benign appearance, Dr. Paraguya's record that the heel ulcer's condition was

13

unchanged based on his *visual* inspection on August 29, 1996, is of no consequence. We presume that Dr. Paraguya's awareness of this fact explains the paradox of Dr. Paraguya's debridement of the original ulcer when his records indicated that the ulcer was visually improving.

At no point did Dr. Paraguya surgically debride the heel ulcer to accurately assess its true condition. Consequently, the Medical Review Board's reliance on Dr. Paraguya's notes that the heel ulcer was unchanged, and, therefore, Mr. Pickering was not septic on August 29, 1996, was misplaced. Moreover, because Dr. Paraguya never recorded the size of the ulcer, his record on August 29 that the appearance of the heel ulcer did not change from Mr. Pickering's previous visit on July 18, was only as good as his memory.

On the other hand, there was testimony of Mr. Pickering's family members that the heel ulcer significantly increased in size and had an odor by August 29. Ms. Breaux's expert endocrinologist testified that it made no medical sense that Mr. Pickering's ulcer could have gone from a small grade one ulcer to essentially his whole foot being infected in eight days. He also testified that Mr. Pickering's fever and vomiting were Mr. Pickering's systemic reactions to the foot infection. Dr. Sandozi, Mr. Pickering's other treating physician, testified that the condition of Mr. Pickering's foot was so dire that the infection had to have been present and noticeable for at least two to three weeks prior to the September emergency room admission. Finally, Mr. Pickering's family members testified that he was compliant with all of Dr. Paraguya's instructions. Based on this evidence, we find that Ms. Breaux established Dr. Paraguya's liability.

## C) DAMAGES

An award of $600,000.00 in general damages for the negligence of a nursing home operator that resulted in an amputated foot and a heart attack of the resident was not abusively high. *Short v. Plantation Mgmt. Corp.*, 99-899 (La.App. 1 Cir. 12/27/00), 781 So.2d 46. An award of $500,000.00 to a sixty-seven year old man in a medical malpractice suit for a lost leg was not an abuse of discretion, where the amputation rendered the patient almost completely immobile, despite a prosthesis and a walker. *Williams v. Jefferson Parish Hosp. Serv. Dist. No. 2*, 604 So.2d 1046 (La.App. 5 Cir.), *writ denied,* 609 So.2d 260 (La.1992). Finally, this court held in a medical malpractice suit that the trial judge correctly increased the award from $150,000.00 to $350,000.00 for physical and mental pain and suffering, loss of enjoyment of life, and scarring and disfigurement that resulted from the patient's loss of a leg. *Blocker v. Rapides Reg'l Med. Ctr.*, 03-745 (La.App. 3 Cir. 12/23/03), 862 So.2d 1220, *writ denied*, 04-215 (La. 3/26/04), 871 So.2d 351.

Similarly, Mr. Pickering underwent several operations and experienced severe physical and mental pain, a dramatically deteriorated quality and enjoyment of life because of his loss of mobility, as well as phantom pain. Although he suffered from diabetes and received benefits for psychological injuries, at the time of the amputation Mr. Pickering was under fifty years of age. After the amputation, he continued to deteriorate physically and emotionally until his death five years later. Thus, the above jurisprudence leads us to award $500,000.00 for Mr. Pickering's loss of his leg in addition to his medical expenses, and legal interest.

15

V.

**CONCLUSION**

The trial court's judgment for the defendants is reversed. This court awards to Sherry Breaux $500,000.00, Mr. Pickering's medical costs associated with the amputation of his right leg, and legal interest. Costs of this appeal are assessed to Dr. Dalmacio Paraguya and his insurer, St. Paul Fire & Marine Insurance Company.

**REVERSED AND RENDERED**.

NUMBER 07-1581

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

JAMES PICKERING, ET AL.

VERSUS

DR. DALMACIA PARAGUYA, ET AL.

AMY, J., dissenting.

I disagree that a reversal is appropriate. Undoubtedly, the trial court erred in referencing the local standard of care in its supplemental instruction since the defendant was practicing as an internist and endocrinologist in the treatment of Mr. Pickering's foot ulcers. However, an erroneous instruction, alone, does not necessarily require reversal of a jury verdict. *Adams v. Rhodia, Inc.*, 07-2110 (La. 5/21/08), 983 So.2d 798. In *Adams*, the Louisiana Supreme Court spoke extensively about the necessity of exercising great restraint before reversing a jury verdict "based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system." *Id.* at 804.

Rather, in the presence of an erroneous jury instruction, an appellate court must consider the entirety of the jury charge to assess whether it provides the "correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." *Adams*, 983 So.2d at 804 (citations omitted). Significantly, the assessment of an erroneous jury charge "requires a comparison of the degree of error with the jury instructions as a whole and circumstances of the case." *Id.* The supreme court further explained that:

> [T]he manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial *de novo*, without first measuring the gravity or degree of error or considering the instructions as a whole and the circumstances of the case. *Brown*, 405 So.2d at 558.

*Id.* at 805. As in the present case, the jury instruction contested in *Adams* was provided in response to a question from the jury. This type of supplemental charge must not be considered independently, but as an addition to the original instruction. *Id.*, quoting *U.S. v. L'Hoste*, 609 F.2d 796, 805 (5 Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 104 (1980). Considering the circumstances of this case, I find no indication that the jury was misled, much less to the point where it was prevented from dispensing justice.

First, the trial court's initial instructions correctly stated that the plaintiff was required to establish by a preponderance of the evidence "that degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians practicing in the same medical specialty as that in which the defendant practices." The supplemental instruction at issue was provided during deliberations when the jury asked merely: "Please elaborate/explain the Question #1 in further detail of the 'Verdict Sheet'." Question #1 inquired only: "Do you find, by a preponderance of the evidence, that the plaintiffs provided the applicable standard of care owed by Dr. Dalmacio Paraguya to James Pickering?" Neither Question #1 nor the jury's inquiry suggest that the jury's inquiry related to whether the standard of care was a local one or a national one. To draw an inference of intent from these general statements is speculative. The jury's question could have been equally directed to the "preponderance of the evidence" portion of the question.

2

Further, the trial court's supplemental instruction in response to the jury's inquiry was a lengthy one, with the objectionable phrase included only at the end of the statement, *after* setting forth the standard of La.R.S. 9:2714. The trial court responded:

> Question number 1 is a question that is drawn from our own Revised Statute 9:2714 which is the statute governing malpractice in this case. And it reads as follows: . . . "*The plaintiff must prove the degree of knowledge and skill possessed or degree of care ordinarily exercised by physicians licensed to practice in the State of Louisiana and actively practicing in similar community or locale and under similar circumstances, and whether defendant practices in a particular specialty and whether last act of medical negligence raised issues peculiar to the medical specialty involved. Then the plaintiff has the burden of proving the degree of care ordinarily practiced by a physician who treats diabetic foot ulcers within the involved medical specialty.*"

> And basically, you have to rely on the testimony of the many expert doctors that testified on both sides. You can look at other evidence in the record and you can consider what the lawyers argued to you even though it's not evidence to assist you *in trying to determine whether or not the plaintiffs have proved that there is a standard of care for treating ulcers, diabetic foot ulcers in this locale and what that standard is.*

> Now, the time period in question is the treatment period when - - from April the 2nd to August the 29th, the period of time that Dr. Paraguya treated Mr. Pickering. And it could be a standard developed during anytime during that period. If you find that any time during that period, from April the 2nd through August 29th, '96, I think it was, that there was a standard that Dr. Paraguya was required to maintain in the treatment of the diabetic ulcers to Mr. Pickering; then you must answer the question, yes.

> If you find during that time period that there was not a required standard expected of a physician treating diabetic foot ulcers, then you answer the question, no. And that ends the considerations.

> If you answer yes, then you go to the next question. So, it can be any time period between April the 2nd and August the 29th. Okay? It doesn't have to be the whole time period. It can be any time period during that treatment process. Okay? And you have to rely upon your recollection of the testimony and your recollection of the evidence that was presented and your recollection, if you find that the arguments of counsel assists you of that; and then, you make a decision whether or not there was a standard. And did they prove that standard. Okay?

3

> All right. Now, I'm going to file this supplemental jury instruction that I read to you and I further explained it. So, then you go back and continue deliberation with regard to question number 1.

(Emphasis added.) In my view, the trial court's reference to the treatment of "diabetic foot ulcers in this locale," was limited and outside of the formal instruction.

The plaintiff and the majority contend the erroneous supplemental instruction requires a de novo review in light of *Todd v. Sauls*, 94-10 (La.App. 3 Cir. 12/21/94), 647 So.2d 1366, *writs denied,* 95-206, 95-219 (La. 3/24/95), 651 So.2d 289, a case also involving the national standard of care. However, in its *initial* instruction to the jury, the trial court in *Todd*, 647 So.2d at 1371, explained that:

> In a malpractice action based on the negligence of a licensed physician, such as Dr. F. Clark Sauls, the plaintiff has the burden of proving first the degree of knowledge and skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the State of Louisiana and actively practicing in a similar community or locale and under similar circumstances and where the defendant practices any particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty. The degree of care ordinarily exercised is the degree of care that the physician gave his other patients when he performed this procedure.

The *Todd* panel concluded this instruction required reversal as it coupled the competing local and national standards with the defendant's name, before concluding that, in light of this inclusion, "the jury was misled by that juxtaposition." *Id*. The panel also found that the reference to "similar community or locale" was only "heightened" by the fact that all three of the plaintiff's medical experts were from outside of Louisiana whereas a number of the defendant's experts were from within Louisiana with the majority from Alexandria, the defendant's locale of practice. *Id.* at 1372. In sum, it was determined that "this differentiation misled the jury." *Id.* The panel, therefore, conducted a de novo review.

4

However, the circumstances in this case render *Todd* distinguishable from this situation. Here, the trial court initially instructed the jury correctly; the problem only arose with a supplemental instruction. Also, the *Todd* panel based its opinion, in part, on the coupling of the defendant's name with the local standard. The majority references this point. However, Dr. Paraguya's name was *not* inserted into the instruction as in *Todd*. And again, the reference to the locality standard was limited when taken in context of the instruction as a whole. Finally, the jury in this matter ultimately determined that the plaintiff, in fact, established the standard of care. This finding is supported by the record, thus revealing no indication that the jury was likely misled.

The plaintiff presented two options for standard of care, including the opinions of Dr. Michael Cooperman and Dr. Ralph Donald Patman, who each testified as to the existence of a national standard of care. However, the plaintiff also presented, by way of cross-examination during its case, the defendant. Dr. Paraguya testified that, at the time he treated Mr. Pickering, nationwide standards for the treatment of diabetic foot ulcers were not yet established. Instead, he explained that there were basic principles in ulcer management and that they were dependent on the physician's judgment given the plaintiff's presentation. He specifically disagreed that many of the standards set forth by Dr. Cooperman were appropriate in the present case given Mr. Pickering's condition as he presented at each of his appointments.

In short, the jury could have accepted the defendant's assertion that nationwide standards had not yet been established. Unlike in *Todd*, the initial contest in this case was whether there was, in fact, a nationwide standard. In this sense, *Todd*'s focus on whether the jury could have been misled by the jury's instructions when the experts were primarily from outside of Louisiana differs from the present case.

5

Additionally, as the trial court observed when providing the supplemental jury instruction, the critical inquiry for the jury became whether there was proof of the standard of care at the time of the August 29th visit and whether that standard was breached. The jury was presented with starkly different accounts of Mr. Pickering's foot on that date. As described by Mr. Pickering's family members, Mr. Pickering's heel ulcer was obviously advanced at the time of the August 29th visit. They explained that the heel ulcer was "oozing" and had a pronounced odor at the time of the examination. Yet, the defendant's record describes the ulcer as unchanged. Dr. Paraguya denied that he would have or could have overlooked the type of ulcer described by Mr. Pickering's family. The defendant admitted that had he done so, he would have breached the standard of care.

Given his admission that he would have breached the applicable standard of care if the ulcer was as pronounced as the plaintiff urges, it seems clear that the jury could have either believed or discounted the plaintiff's version of events. Also, the jury could have found that Dr. Paraguya set forth the applicable standard of care under these circumstances. It could have done so without having been misled by the jury instructions.

Further, the record reveals no manifest error in the jury's subsequent determination that the plaintiff failed to establish a breach of the standard of care. *See Adams*, 983 So.2d 798. First, the jury could have chosen to place little weight on, or afford little credibility to, the deposition testimony of Mr. Pickering and that of his family regarding the deteriorated condition of the heel ulcer. Instead, it could have favored Dr. Paraguya's testimony as well as his notations from the August 29th visit. The notes indicate that, instead of obvious deterioration, the wound was unchanged. Although Mr. Pickering's condition clearly deteriorated by the time of his admission

6

to the hospital on September 6th, testimony was presented supporting the view that such a rapid demise was possible in a diabetic foot ulcer. Finally, the Medical Review Panel opinion was entered into evidence and revealed the following decision: "The evidence does not support the conclusion that the defendant, Dr. Dalmacio S. Paraguya, failed to comply with the appropriate standard of care as charged in the complaint." The panel's written reasons indicate:

> A vascular work up was not indicated since most diabetics at this stage of diabetic foot disease do not have palpable pedal pulse. Revascularization often fails due to small vessel disease common to diabetics.
>
> Hospital records indicate that the patient received diabetic education including foot care.
>
> Dr. Paraguya did do a chemical debridement with Elase at the appropriate time, and later also did surgical debridement.
>
> A second ulcer would not trigger the need for more aggressive treatment absent any signs of acute infection.
>
> On the August 29, 1996, visit when the patient presented complaining of nausea and vomiting, Dr. Paraguya noted "Right foot ulcer anteriorly continues to improve. The ulcer in the right heel is unchanged." We do not feel that the patient was septic at the time due to lack of signs of acute infection in the foot, and if the patient were septic he would have been expected to develop vascular collapse prior to the September 6, 1996 hospitalization.

In light of this evidence, I conclude that the record supports the jury's determination that the plaintiff failed to satisfy its burden of proving breach of the applicable standard of care.

Finally, I reject the plaintiff's assertion, and the majority's conclusion, that the error in the trial court's jury instruction was compounded by the reference to the premise that a treating physician's testimony is generally accorded more weight than that of a physician who reviews records for purposes of testifying at trial. This instruction provided:

7

The testimony of a treating physician is generally accorded more weight than that of a physician who merely examines records for purposes of testifying at trial.

The trial court addressed the plaintiff's argument that this instruction should be inapplicable when the defendant is the treating physician and noted that the plaintiff also presented the testimony of Dr. Shakeel Sandozi, Mr. Pickering's subsequent treating physician, who testified in favor of the plaintiff. The colloquy on this point reflects:

MR. TOWNSLEY:

. . . We had an objection to a paragraph on page four. It's the second full paragraph. And it says, quote, "The testimony of the treating physician is generally accorded more weight than that of a physician who merely examines records for purposes of testifying at trial."

It's my position, Judge, that that is an appropriate charge for a personal injury case, an auto accident case or Worker's Compensation case. It's not an appropriate charge for a medical malpractice case. And you can see why, Judge, its - - Paraguya was the treating physician. And so, you are instructing the jury to give him more weight than all of the other physicians who came in here to testify. That's inappropriate in a malpractice case, and I think it could be extremely harmful and prejudicial to the jury here.

THE COURT:

You know, I thought about that; however, one of the issues is whether or not the time period for the onset of this infection started prior to August 29th, certainly prior to September 6th when he [was] brought too [sic] Memorial Hospital - - Moss Regional Hospital. And in fact, the treating physician that did the surgery at Moss indicated he thought it was around about the 20th or earlier that it started. So, that worked both ways. The doctor that testified for the Plaintiff was a treating physician on that question, and that's a very important question. I think that is, perhaps the key issue in the case, whether or not the doctor should have seen something on the 29th of August, an infection, according to your treating physician that did the surgery said had to exist at that time.

So, I think it worked both ways. So, I decided to leave it in because in this particular case, it goes both ways. Dr. Paraguya is a treating physician, but most of the stuff that he testified about would come down to the 29th, what he saw, should have seen on the 29th. So, I think it works for the Plaintiff as well.

8

While the majority discounts this reasoning, I find no error therein as it accurately reflects a jurisprudential presumption and, again, two treating physicians testified in this case. The charge referred generally to the treating physician and did not specifically reference either of the two treating physicians presented. The above colloquy occurred outside the presence of the jury. Moreover, this charge was part of the initial instructions and was not a part of the supplemental instruction at issue. In my view, these factors militate against the conclusion of the majority, that this instruction magnified the trial court's error in the supplemental instruction.

As I find that a de novo review is not warranted and that the record supports the jury's determination in favor of the defendant, I respectfully dissent from the majority opinion.